Receipt #061290

ORIGINAL

ECF

FILED
AUG 27 2004
U.S. COURT OF FEDERAL CLAIMS

PAUL F. DAUER (CALIFORNIA BAR NO. 37428)
LAW OFFICES OF PAUL F. DAUER
400 CAPITOL MALL, SUITE 2950
SACRAMENTO, CA 95814
TELEPHONE: (916) 448-2431
FACSIMILE: (916) 448-2462
EMAIL: PFDAUER@PFDATTY.COM

JENNIFER L. MCCREADY (CALIFORNIA BAR NO. 179262)
LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814
TELEPHONE: (916) 325-4000
FACSIMILE: (916) 325-4010
EMAIL: JENNIFER.MCCREADY@BBKLAW.COM

Attorneys for Plaintiff
FIRE-TROL HOLDINGS LLC

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FIRE-TROL HOLDINGS LLC,

Plaintiff,

v.

UNITED STATES

Defendant.

Case No.: 04-1389C

**COMPLAINT FOR DECLARATORY RELIEF AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

## INTRODUCTION

1. This is an action seeking review of final decisions by the United States Forest Service ("USFS") to prohibit the use of sodium ferrocyanide (also known as yellow prussiate of soda, or "YP Soda" or "YPS") and to require the use of a gum thickener in wildland fire retardant products sold to the USFS for use in fighting forest fires. The USFS failed to follow statutory and regulatory requirements in adopting its rules that it would not accept retardants containing YP Soda and would require a gum thickener in retardants purchased by the USFS. The USFS also failed to follow statutory and regulatory requirements in modifying its requirements for qualifying products to be included on the "qualified products list" for wildland fire retardant chemicals. Even if the USFS had followed the procedural requirements, its decisions to ban YP Soda and to require a gum thickener in wildland fire retardants are arbitrary and capricious and unsupported by the evidence. The effect of the USFS' rulemaking is to limit the bidding for wildland fire retardant products to one bidder, in violation of the Competition in Contracting Act, thus creating a monopoly supplier of wildland fire retardant products to governmental agencies, in particular the Bureau of Land Management ("BLM") and the USFS.

## JURISDICTION

2. This action was originally filed in the District Court for the District of Arizona in October 2003. That court denied the USFS' motion to dismiss on the grounds that the complaint was too complex. Following that ruling, the USFS moved to dismiss for lack of subject matter jurisdiction. On August 13, 2004, the district court dismissed the action on the ground that exclusive jurisdiction over the entirety of the action, as being "in connection with a proposed procurement," lies in the Court of Federal Claims. A true and correct copy of that ruling is attached hereto as Exhibit A.

3. As found by the district court, this court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1491(b) because the instant action is one by an interested party objecting to violations of the federal Administrative Procedure Act

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

("APA") and federal Competition in Contracting Act ("CICA") in connection with proposed procurements.

**PARTIES**

4. Plaintiff Fire-Trol Holdings L.L.C. ("Fire-Trol") is a Delaware Limited Liability Company, with its principal place of business in Phoenix, Arizona. Fire-Trol is the leading manufacturer of fire retardant chemical products used to fight wildland fires in the United States, Canada, and Europe. Fire-Trol is one of only two manufacturers of wildland fire retardant approved for use in the United States.

5. Defendant USFS is an agency of the United States Department of Agriculture with the responsibility for managing public lands in national forests and grasslands. As part of its responsibilities, the USFS provides for fire protection which, at all relevant times herein, has included contracting for and applying fire retardant products to facilitate fighting wildland fires.

**USFS FIRE RETARDANT ACQUISITION**

6. To conduct its procurements of wildland fire retardant, the USFS uses a qualification requirement, as defined in 41 U.S.C. section 253c. After a retardant has been examined, tested in accordance with established protocols in the qualification specification, and found to comply with the government's standard specification requirements, it may be listed on the wildland fire retardant qualified products list ("QPL").

7. The specifications for wildland fire retardants require detailed testing, including but not limited to requirements to test the retardant's efficacy, to ensure that the retardant will remain in solution and maintain its potency during extended storage, and to ensure that it will not corrode fire fighting equipment. Detailed lab testing requirements include a twelve-month shelf-life test, and can require eighteen months or more of tests. In addition, after a product has satisfied lab testing, it may be required to undergo field testing, including over-winter storage requirements and post-storage corrosion testing, which require an additional twelve months or more to complete. Prior to April 5, 2003,

when the USFS purported to alter standards for listing products, the last wholly new product listed under the established testing procedures was listed in 1996.

8. Currently, listed wildland fire retardants are manufactured by two companies, Plaintiff Fire-Trol and Astaris L.L.C. ("Astaris"). Plaintiff is informed and believes and thereon alleges that no manufacturer other than Fire-Trol and its predecessor or Astaris and its predecessors has had a wildland fire retardant listed on the USFS' QPL since wildland retardant specification 5100-304a was adopted in 1986.

9. The USFS and other federal, state, and national agencies in the United States and elsewhere have been successfully using Fire-Trol wildland fire retardants for over 40 years, which retardants have contained YP Soda for the last 30 years.

10. Under the wildland fire retardant contracts, Fire-Trol and Astaris provide the fire retardant that the USFS drops from fixed-wing aircraft and helicopters to help reduce the scope, severity, and/or duration of wildland fires. USFS personnel, agents, or contractors under USFS control and direction apply the wildland fire retardants. Fire-Trol does not apply the wildland fire retardants supplied under its contracts with the USFS.

11. In three-year contract cycles, the USFS conducts competitive procurements to award requirements contracts at USFS and BLM fire fighting bases. Previous contracts have been awarded for one year terms with two one-year extension options, for a total of a three year contract cycle. Historically, the USFS has exercised the options to effect a three-year contract term. One contract is for purchase of bulk retardant and one contract is for retardant delivered "mixed and loaded." Contract awards are made firebase-by-firebase to the winning proposer/bidder for each firebase.

12. In the 2004 procurement, the USFS awarded contracts for different terms to stagger the awards and allow for approximately one-third of the volume of retardant to be reprocured each year, rather than all of the contracts being reprocured every three years. Accordingly, approximately one-third of the contracts (based on anticipated volume of retardant demand) were awarded for only one base year, another third for one base year plus one one-year option, and the remainder for one base year plus two one-year options.

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

Fire-Trol is informed and believes and thereon alleges that, when the contracts awarded in 2004 expire, the USFS intends to reprocure the contracts for the standard one-year term plus two one-year options.

13. In the past, the USFS has emphasized the importance of maintaining competition in the wildland fire retardant market. In the 1998-2000 contract cycle, the USFS requested – and Fire-Trol agreed – that Fire-Trol give up contracts to Fire-Trol's competitor to ensure continuing viability of that competitor in the marketplace.

14. The current wildland fire retardant contracts will expire in early 2005. The USFS is expected to exercise the available options on two-thirds of the contracts, and to reprocure only those contracts with no options to extend. The USFS further is expected to issue the solicitation for 2005 through 2007 wildland fire retardant contracts in the third to fourth quarter of 2004.

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

**CORROSION INHIBITORS**

15. All wildland fire retardant chemical products used by the USFS, and other agencies pursuant to USFS nationwide wildland fire retardant contracts, must meet corrosion standards set forth in the standard specifications. All wildland fire retardant products currently listed on the QPL contain one or more corrosion inhibitors to meet that standard. Without incorporation of corrosion inhibitors in retardants, significant structural damage will occur to vital parts of the tanker aircraft (*e.g.*, control surfaces) and other firefighting equipment, including storage tanks.

16. YP Soda is one corrosion inhibitor used in fire retardants. Fire-Trol uses YP Soda as the corrosion inhibitor in all of its wildland fire retardants which are listed on the QPL as meeting the specifications of the USFS.

17. YP Soda is added to prevent caking in both table salt, which people consume, and road de-icing salt, which the USFS purchases and applies to roads and bridges under its control.

18. Plaintiff is informed and believes and thereon alleges that road de-icing salts containing YP Soda are used annually on multiple times the number of acres as are treated

with Fire-Trol fire retardants. In particular, although application of wildland fire retardants is generally prohibited by USFS policy within 300 feet of waterways, road de-icing salts containing YP Soda are commonly placed on bridges over waterways, allowing ice-melt to wash YP Soda directly into surface waters.

19. With respect to wildland fire retardant, YP Soda is one of the only effective ingredients to inhibit corrosion in storage tanks and in the aircraft that deliver the product to control wildland fires. Notwithstanding a concerted research and development program, Fire-Trol has been unable to identify another corrosion inhibitor which is environmentally acceptable, which meets the USFS anti-corrosion requirements, and whose commercial use would not be inhibited or prevented by patent laws.

20. YP Soda includes the constituent cyanide. There are two different forms of cyanide: simple and complex. Simple cyanide, such as hydrogen cyanide, is toxic. Simple cyanide is a natural byproduct of wildland fires, and can be found in post-fire residues.

21. Complex cyanide, such as YP Soda, is very stable because it is bonded to a metal element. Although more stable than simple cyanide, some complex cyanides (including YP Soda), if dissolved in water, **may** release cyanide upon exposure to ultraviolet light. The toxicity of the cyanide depends on the amount of simple cyanide released, which may be influenced by a variety of environmental factors.

22. Most substances, including milk or even water, can be toxic to organisms, depending on the circumstances of exposure. A toxic product is not necessarily "hazardous." "Hazard" is determined by considering the likelihood of the organism being exposed to a toxic level of the substance. Substances are not hazardous if the likelihood of a toxic exposure is remote.

23. Based on risk assessments performed in 1994 and 1996, the USFS has expressly acknowledged that use of YP Soda as a corrosion inhibitor in fire retardant chemical products "does not pose a health hazard to humans."

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

## WILDLAND FIRE RETARDANT USE

24. Wildland fires can be tremendously destructive of lives (both human and animal), habitats, and property.

25. Plaintiff is informed and believes and thereon alleges that the USFS' rule banning retardants containing YP Soda, challenged herein, is based on the USFS' concerns over potential harm to aquatic environments and species. Wildland fires harm aquatic species by heating surface waters to lethal temperatures, changing water pH, increasing ammonia levels from smoke gases, increasing phosphate, cyanide and ammonia levels leached from ash, creating ash which can interfere with fish gill operation, and causing other harmful effects.

26. One harmful effect of a wildland fire is the creation of free cyanide from burning carbon in a reducing atmosphere. For example, following the 2000 "Cerro Grande" fire in Los Alamos, New Mexico, cyanide was found in storm water runoff from non-retardant-impacted areas. The chemical diagnostic ratios from samples from the Cerro Grande fire did not implicate wildland fire retardants as a source of the cyanide, irrespective of whether retardant was used in the area from which the samples were taken.

27. Use of wildland fire retardants to control or minimize wildland fires may reduce the overall incidence of cyanide following a wildfire by reducing amounts of naturally generated cyanide byproducts of wildland fires.

28. Most wildland fire retardant is applied to vegetation on ridge tops and higher topographic elevations, in part because canyon areas are difficult, and can be dangerous, to reach with fixed wing air tankers. Surface waters are commonly located in canyons rather than on ridge tops. Most retardant is not dropped adjacent to or into surface waters.

29. Wildland fire retardant is only rarely intentionally dropped into surface waters.

30. A 1991 study titled *Forest Chemicals* by L.A. Norris, H. W. Lorz and S. V. Gregory (American Fishery Society Special Publication 19:207-296) (hereafter "*Forest*

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

*Chemicals* Study") found that, when fire retardant is dropped near surface waters, use of narrow, untreated strips of as little as three meters (ten feet) wide adjacent to the water can virtually eliminate retardant entering waters.

31. Plaintiff is informed and believes and thereon alleges that the USFS seeks to avoid application of all fire retardants to surface waters and to minimize the amount of fire retardant that enters surface waters. Ammonia, which is present in all fire retardants, is toxic and may be hazardous to fish and other aquatic species.

32. In April, 2000, the USFS participated in an Endangered Species Act "Section 7 Interagency Consultations" (16 U.S.C. §1536(a)(2); 50 C.F.R. § 402.01(a).) with the United States Fish and Wildlife Service ("USFWS") and the National Marine Fisheries Service ("NMFS") (hereafter, the "April 2000 Consultations"). The April 2000 Consultations were held to discuss minimizing potential risks to listed aquatic species when firefighting agencies utilize any fire retardant chemicals in wildland fire fighting.

33. In connection with the April 2000 Consultations, the parties discussed the update to the USFS *Guidelines for Aerial Application of Retardants and Foams in Aquatic Environments* ("*Guidelines*"), governing aerial application of wildland fire fighting chemicals, to minimize any potential impact on aquatic species. The *Guidelines* generally prohibit application of wildland fire retardant 300 feet or less from a body of water, except when necessary to protect life or property. If wildland fire retardant is applied within 300 feet of a waterway, the unit administrator is required to determine whether any threatened or endangered species within the aquatic environment has been adversely affected.

34. Following the April 2000 Consultations, the USFWS and the NMFS agreed that compliance with the *Guidelines* was presumed to avoid adverse effects to protected species and their habitats, and that no additional consultation would be necessary absent actual, observed adverse effects.

35. The USFS has expressly acknowledged that there is no past record of environmental harm from use of fire fighting chemicals, including those containing YP Soda, when they are applied in a proper manner conforming to USFS *Guidelines*.

36. Instances of fire retardant being released into surface waters contrary to the USFS *Guidelines* are extremely rare. The USFS Director of Operations for the National Interagency Fire Center in Boise, Idaho, Alice Forbes, admitted that fire retardant is dropped into surface waters only a "very, very small percentage" of the time.

37. Plaintiff is informed and believes and thereon alleges that, since the April 2000 *Guidelines* were approved, the USFS has requested an Endangered Species Act Section 7 consultation only rarely, and that no report arising from any consultation has found evidence that fish mortality was caused by retardant entering surface waters.

38. When wildland fire retardants are used in accordance with the *Guidelines*, the risk of retardant reaching surface waters through runoff is *de minimis*. Even when retardant is dropped less than 300 feet from surface waters, the likelihood of substantial amounts of retardant reaching surface waters through runoff is remote. The *Forest Chemicals* Study found that untreated strips as narrow as three meters (ten feet) from the surface waters virtually eliminated retardant entering streams.

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

**USFS RULE PROHIBITING RETARDANTS CONTAINING YP SODA**

39. On March 28, 2000, Defendant USFS' issued an Order to Suspend Work ("Stop Work Order") to Fire-Trol halting the USFS' purchases of wildland fire retardant from Fire-Trol under the existing contracts.

40. Alice Forbes, then the USFS Branch Chief, Fire Equipment and Chemicals, and Frank Gomez, USFS employee and Contracting Officer for retardant contracts, participated in a teleconference with representatives of Fire Trol on March 28, 2000. Ms. Forbes and Mr. Gomez informed Fire Trol that the Stop Work Order was based on the U.S. Geological Survey, Columbia Environmental Research Center study from March, 2000 titled *The Effects of UVB Radiation on the Toxicity of Fire-fighting Chemicals* ("USGS 2000 Study"). Ms. Forbes told Fire-Trol that she understood the USGS 2000 Study to indicate that Fire-Trol retardants violated EPA standards.

41. An Interagency Fire and Aviation Management Communication Strategy, dated April 20, 2000 (hereafter "April 20 Communication Strategy"), reflects that

Defendant USFS' rationale for the Stop Work Order was concern about 1) impacts of YP Soda on employees, the public, and the environment 2) violating EPA guidelines and rules, and 3) "the social/political issues associated with public perceptions on dropping a product with sodium ferrocyanide on Federal lands."

42. Ms. Cecelia Johnson, a USFS employee and project leader of the Fire Chemicals Wildland Fire Chemical Systems Program, was responsible for the administration of the USFS' contract with the USGS to perform the USGS 2000 Study, including participating in review and editing of a minimum of nine draft versions of the report and three separate "final" versions of the report. On March 29, 2000, Ms. Johnson wrote to her supervisor Mr. Paul Solarz, Program Leader, Wildland Fire Chemical Systems for the USFS. In that e-mail, Ms. Johnson admitted that she was "in way over my head (actually flailing away in quick sand is more like it)" with respect to the applicable regulations and the meaning of the USGS 2000 Study. Ms. Johnson's e-mail evidences that, the day **after** acting on unfounded fears of risk from YP Soda, Defendant USFS acknowledged the need for assistance in evaluating risks and regulations relating to retardants containing YP Soda.

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

43. Notwithstanding its claimed grounds for the Stop Work Order, Defendant knew from earlier risk assessments that there was minimal risk to the public and employees from YP Soda. Defendant USFS also knew that YP Soda is commonly used, including in road de-icing salts applied on USFS lands and in table salt. USFS also knew of the potential for aqueous solutions of YP Soda to degrade to free cyanide in the presence of UV light.

44. The USGS 2000 Study did not state that application of wildland fire retardants containing YP Soda violated federal statutes or regulations. Minimal research or consultation with USFS counsel would have disclosed to Defendant USFS that law or regulation does not prohibit the application of YP Soda in wildland fire fighting. (*See* 40 C.F.R. §§ 122.3, 122.27.) USFS' counsel stated to Fire-Trol's counsel that the USFS never consulted its counsel prior to the issuance of the Stop Work Order.

45. In a meeting with Fire-Trol on or about April 3, 2000, Alice Forbes and Frank Gomez stated to Fire-Trol representatives that the decision-makers on the Stop Work Order did not consult with legal counsel or environmental experts prior to issuing the Stop Work Order.

46. Basing a decision to ban YP Soda in wildland fire retardants on Defendant USFS' speculation of an adverse public reaction is an abuse of discretion, particularly when the USFS has not indicated an intent to stop purchasing road de-icing salts which also contain a YP Soda constituent. Acting without even minimal consultation with legal and environmental experts, Defendant USFS abused its discretion by acting with a lack of due diligence in issuing the Stop Work Order and in instituting a rule banning YP Soda in wildland fire retardants.

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

47. Plaintiff is informed and believes and thereon alleges that the USFS commissioned the USGS 2000 Study as the result of allegations to certain USFS employees by Astaris, Fire-Trol's sole competitor, that YP Soda posed a danger to the environment. Plaintiff is further informed and believes and thereon alleges that Astaris' campaign against YP Soda has included express or implied threats to the USFS to politicize and/or publicize Astaris' position that YP Soda is "dangerous." Astaris' campaign against YP Soda arose after Astaris' attempts to use YP Soda as a corrosion inhibitor were frustrated by Fire-Trol's successful defense of its patents in a 1991 infringement suit against Astaris. (*Chemonics Indus. Inc. v. Monsanto Co.* (United States District Court for the Central District of California, Case No. SA CV 91-641).)

48. Plaintiff is informed and believes and thereon alleges that the USFS' reaction to the preliminary findings in the USGS 2000 Study and issuance of the Stop Work Order were due, in part, to the alarm instilled by Astaris' campaign against YP Soda.

49. After meeting with Fire-Trol's experts on April 3, 2000 and upon investigating the basis for the Stop Work Order, Defendant USFS realized that the Order was unfounded and revoked the Stop Work Order on April 20, 2000.

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

50. Defendant USFS acknowledged that the USGS 2000 Study did not represent true field conditions and committed that the in-depth field testing recommended in the Study would be conducted to determine the effects of wildland fire retardant on real-world aquatic environments.

51. Defendant USFS' paranoia over anticipated public perception is reflected in its actions only one month after rescinding the Stop Work Order and announcing the need for field studies of the effects of YP Soda. A June 1, 2000 letter from the USFS Director of Fire and Aviation Management set forth the USFS' May 26, 2000 decision to apply its rule against purchasing wildland fire retardants containing YP Soda beginning with the 2004 through 2006 contract cycle.

52. In making the May 26 decision, Defendant ignored both its own conclusion that field research on YP Soda was necessary and the U.S. Geological Survey ("USGS") laboratory scientists' recommendation (alleged below) that field research was necessary to assess the potential hazards associated with fire fighting chemicals.

53. Instead of waiting for the results of field studies, which were not completed in the few weeks following the preliminary USGS 2000 Study, Defendant USFS immediately announced a ban on wildland fire retardants containing YP Soda, which ban was to begin in 2004. Defendant had no reason, other than its irrational fear of public reaction, to announce the ban prior to conducting the necessary field studies and risk assessment to determine whether the ban could be justified.

54. Following the USFS' June 2000 letter, Fire-Trol informed the USFS that Fire-Trol had insufficient time to identify, develop, and qualify a wildland fire retardant product by 2004 containing a corrosion inhibitor other than YP Soda.

55. The shortage of time was exacerbated by the unavailability of a USFS testing facility, called a "burn chamber," necessary to perform combustion retarding effectiveness lab testing to qualify a fire retardant product. Fire-Trol is informed and believes and thereon alleges that the USFS modified its burn chamber, was unable to properly calibrate the modified facility, and was unable to achieve consistent,

reproducible results from that facility following the modification. The USFS informed Fire-Trol that certain of the fire retardant products on the current QPL did not comply with the burn test specifications using the modified burn chamber. Without a properly calibrated burn chamber, the USFS could not reliably test retardants for compliance with the standard specifications or conclude that a wildland fire retardant would be effective, so no retardant could complete the testing necessary to qualify for listing on the wildland fire retardant QPL in time for the 2004 procurement.

56. Defendant USFS has never rescinded its unfounded rule banning retardants containing YP Soda, but has continued to insist that it will discontinue purchasing such retardants once the current retardant contracts expire. Although the USFS has changed the date for implementing its rule banning YP Soda, the USFS' rule against retardants containing YP Soda has been repeatedly and consistently reiterated in a series of letters to Fire-Trol and other communications by the USFS.

57. In a January 31, 2002 response to correspondence from Fire-Trol asking the Defendant USFS to rescind its rule that it would not purchase retardants containing YP Soda, the USFS Director of Fire and Aviation Management reiterated the rule banning retardants containing YP Soda. That letter stated, "[b]ecause other, less toxic, alternatives are available at reasonable cost, the Forest Service does not want YP Soda in retardant."

58. In a letter dated May 26, 2002, the USFS repeated its rule against purchasing retardants containing YP Soda, stating that the USFS "will not accept retardants containing sodium ferrocyanide (YPS) for the 2004 contract cycle," as expressed in the USFS' June 1, 2000 letter.

59. In a July 19, 2002 letter to the GAO in response to a protest by Fire-Trol, Defendant USFS represented that it intended to withdraw its May 26 letter, but that it "intends to **continue its position** that it will not accept retardants containing YP Soda . . .." (Emphasis added.)

60. By letter dated August 2, 2002, Defendant USFS withdrew its May 26 letter, but stated that it "continues to sustain the fundamentals of [its] position" that it would not

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

accept retardants containing YP Soda beginning with the 2004 contract cycle. The author also explained that the USFS was "directing the removal of YPS from all retardant products."

61. Following Fire-Trol's extensive negotiations with the Defendant USFS regarding its position on YP Soda and other matters, the USFS agreed, in a letter dated October 4, 2002, to "allow an additional year to our original position" that the ban on YP Soda would be effective beginning in 2004.

62. The October 4 letter states that Defendant USFS will implement its ban on YP Soda beginning with the 2005 procurement of retardant, following the expiration of the one-year contracts awarded for 2004 and any of the two- or three-year contracts for which the USFS elects not to exercise its options.

63. The USFS has historically exercised the options to take advantage of the full three-year period, and the USFS has indicated its intent to structure the 2004 procurement to allow for one-third of the volume of retardant demand to be re-procured each year. However, the USFS would have the contract right to elect not to exercise the options in Fire-Trol's contracts so that all of the contracts for bases awarded to Fire-Trol would be re-procured in the 2005 contract cycle.

64. Defendant USFS adopted its rule banning the use of YP Soda in wildland fire retardants without first determining whether, based on field testing and ecological risk assessments, actual use of YP Soda poses a hazard to aquatic species materially different from the hazard posed by the ammonia present in all fire retardants. Because all fire fighting chemical products release ammonia when introduced to water, the USFS has expressly recognized that all fire retardant chemical products, whether or not they contain YP Soda, can be harmful to aquatic species if the product is released directly onto or into a stream or other body of water.

65. Defendant USFS also adopted its rule banning the use of YP Soda in wildland fire retardants without addressing the inconsistency in failing to ban road salt or other products used by the USFS containing a YP Soda constituent.

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

66. Defendant USFS also adopted its rule banning the use of YP Soda in wildland fire retardants due to claimed additive toxicity allegedly arising from cyanide released from the retardant, without addressing the fact that cyanide may be present in surface waters as a result of the natural effects of a wildland fire. Any fire retardant in surface waters, including those that do not contain YP Soda, may exhibit the claimed "additive toxicity" effect in the presence of such naturally occurring cyanide.

67. Since Astaris began its campaign against YP Soda, Fire-Trol has been attempting to educate the USFS on the chemical reactions and *de minimis* risks of toxic exposure arising from YP Soda in Fire-Trol's wildland fire retardant. In the last three years, following each announcement of the rule banning YP Soda, Fire-Trol has addressed the USFS' concerns and identified the fallacies in the USFS' conclusion that YP Soda in wildland fire retardant poses a hazard.

68. Fire-Trol's extensive actions to address USFS concerns regarding YP Soda include, but are not limited to, the following:

(a) For years prior to the issuance of the Stop Work Order, Fire-Trol provided information to the USFS regarding the chemistry of YP Soda;

(b) On April 3, 2000, immediately following the issuance of the Stop Work Order, Fire-Trol representatives met with USFS representatives to discuss the legal, scientific, and factual fallacies underlying the decision to issue the Stop Work Order and the dramatic impact of the order on Fire-Trol. Fire-Trol representatives were in regular contact with the USFS throughout the period that the Stop Work Order was in effect;

(c) Fire-Trol was forced to respond to reports, which were later admitted to be unfounded, that cyanide detected following the Cerro Grande fire most likely was the result of fire retardants used to fight the fire. At the request of the USFS, Fire-Trol wrote letters addressing the issue, provided experts to respond to concerns, and sent representatives to meetings in New Mexico, among other responses;

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

(d) Following the June 1, 2000 letter announcing the USFS' rule banning YP Soda in wildland fire retardants, Fire-Trol has had numerous meetings, both in person in Washington, D.C. and on the telephone, and has provided numerous follow-up letters addressing the USFS' concerns about, and its decision to ban, YP Soda;

(e) Fire-Trol filed a protest with GAO challenging the USFS' May 26, 2002 letter, which resulted in the USFS taking corrective action by withdrawing that letter; and

(f) On December 18, 2002, Fire-Trol met with the USFS Chief and provided documentation substantiating Fire-Trol's belief that reasonable resolution of the YP Soda and gum thickening issues was being precluded by certain USFS employees who have an irrational, unscientific resolve that YP Soda must be removed from wildland fire retardant.

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

69. Defendant USFS has failed to follow through on various commitments to comply with applicable laws and regulations and to apply good science in considering whether to implement a ban on YP Soda. Instead, Defendant continues to assert and attempt to justify its original, unfounded rule that it will not purchase wildland fire retardants containing YP Soda, regardless of whether the ban is lawful, consistent with other USFS policy, required by the needs of the USFS, or supported by good science. If the USFS had adopted its rule in accordance with the notice and comment requirements of the APA, the basis for its decision would have been disclosed, and errors or oversights identified. Plaintiff Fire-Trol has no option at this time except to seek the Court's intervention in this matter.

70. Defendant USFS' letters document a final decision by the USFS not to allow YP Soda in products purchased by the USFS to fight wildland fires. This final decision constitutes a rule that, as described in this complaint, has no scientific basis and is arbitrary and capricious, an abuse of discretion, and contrary to law.

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

## THE UNITED STATES GEOLOGICAL SURVEY STUDIES

71. The Defendant's decision at issue in this dispute is based principally on its erroneous understanding and interpretation of the preliminary USGS 2000 Study. This study does not provide evidence of a hazard to human health or the environment from proper use of wildland fire retardant products containing YP Soda to fight forest fires.

72. To obtain the fire retardant sample that formed the basis of the USGS 2000 Study, USFS personnel surreptitiously appropriated samples of Fire-Trol products that had been provided by Fire-Trol to the USFS for visibility testing by the USFS. Use of the sample for the USGS 2000 Study was not authorized by the agreement pursuant to which Fire-Trol provided the sample to the USFS. When the misappropriation was discovered, Cecilia Johnson confessed in an e-mail to another USFS employee that "the cat is out of the bag," reflecting the furtive genesis of the Study.

73. In the USGS 2000 Study, rainbow trout and leopard frog tadpoles were exposed in glass beakers to various fire fighting chemical products currently used by the USFS. The USGS 2000 Study showed that **all** products, with and without YP Soda, can be lethal to the trout and tadpoles. Trout and tadpole lethality was attributed, at least in part, to the presence of ammonia in all retardants.

74. Defendant USFS has admitted on numerous occasions that the USGS 2000 Study is not representative of actual field conditions and, thus, does not provide a basis for assessing actual risks to aquatic species under actual fire fighting conditions. The USGS 2000 Study recognizes that it is not representative of actual field conditions. In addition, Defendant has admitted that the USGS 2000 Study:

(a) ". . . was performed in a closed tank under artificial UV light and should be considered suspect until an in-depth regime of field testing can be performed." (Undated Memorandum from José Cruz regarding Fire Retardant Suspension, File Code 5160.)

(b) ". . . was performed in a closed tank under artificial UV light and does not represent true field conditions." (Briefing paper, Fire and Aviation

Management (April 20, 2000); April 20 Communication Strategy.)

(c) ". . . was completed in a laboratory setting and it may not accurately reflect what actually occurs in the environment." (National Interagency Fire Center News Flash (April 20, 2000).)

75. The only recommendations contained in the USGS 2000 Study pertained to the need for further study, including a field review of toxicity and environmental persistence "to understand the probability of biological injury from the application of these [wildland fire retardant] substances." The USGS 2000 Study also recommended a study on fish avoidance of retardant in surface waters.

76. The USGS 2000 Study does not provide a sound scientific basis for evaluating the potential impact of fire fighting chemical products **as applied in the field**, nor does the USGS 2000 Study provide a sound scientific basis for Defendant USFS' final decision to prohibit all use of YP Soda in fire retardant chemical products to fight wildland fires.

77. The principal author of the USGS 2000 Study, Dr. Edward Little, told Fire-Trol representatives that the Study does not provide an adequate basis for the USFS banning the use of wildland fire retardant containing YP Soda.

78. Following the USGS 2000 Study, the USFS purported to conduct "field testing." Plaintiff is informed and believes and thereon alleges that purpose of the testing actually conducted was to give the appearance of support for the USFS' previously-announced decision to ban wildland fire retardants containing YP Soda, not to determine whether use of wildland fire retardants containing YP Soda poses any hazard to aquatic environments materially different from wildland fire retardants that do not contain YP Soda.

79. The reports resulting from those tests are: a) Effects of Fire-Retardant Chemicals, Fire-Trol® GTS-R and Phos-Chek® D75-R to Fathead Minnows in Pond Enclosure Studies (Little and Calfee, 2002); b) Effects of Fire-Retardant Chemical Products on Fathead Minnows in Experimental Streams (Little and Calfee, 2002)



LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

(hereafter, "Experimental Streams Report"); c) Environmental Persistence and Toxicity of Fire-Retardant Chemicals, Fire-Trol® GTS-R and Phos-Chek® D75-R to Fathead Minnows (Little and Calfee, 2002); and d) Behavioral Avoidance/Attractance Response of Rainbow Trout to Fire-Retardant Chemicals (Little et al., 2002) (hereafter, "Avoidance/Attractance Report"). The reports were summarized in Environmental Implications of Fire-Retardant Chemicals (Little and Calfee, 2002) (hereafter, "Summary Report"). The reports, and the studies giving rise to the reports, are collectively referred to herein as the "2002 Studies."

80. Fire-Trol was not allowed to participate in the 2002 Studies, and was not asked to comment on the 2002 Studies prior to their publication.

81. The 2002 Studies do not evaluate the effects of wildland fire retardant on aquatic environments in a firefighting context, including, but not limited to, the effects of burning, heat, ash, and other chemical compounds, including cyanide, generated by wildland fires.

82. In a letter dated April 19, 2000, the USFS represented to the USFWS that it would "monitor areas where these [wildland fire retardant] chemicals are dropped during the 2000 season." Contrary to that commitment, the 2002 Studies do not rely on field data from the 2000, or any other, fire season.

83. The 2002 Studies rely on an assumption that toxic amounts of retardant chemicals will reach surface waters through runoff. The 2002 Studies made no attempt to determine the likelihood of toxic amounts of retardant chemicals reaching surface waters through runoff. The *Forest Chemicals* Study, conducted in the field, found no significant amounts of retardant chemicals reached surface waters as a result of runoff following application of fire retardant. Similarly, a recent study of four large fires found that wildland fire retardant runoff did not significantly contribute to ammonia or cyanide present in streams following fires.

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

84. The 2002 Studies are not, and do not purport to be, an ecological risk assessment to determine the likelihood of any harm arising from the use of any fire retardant product.

85. For example, the 2002 Studies focus on the toxicity of wildland fire retardant, but the Summary Report acknowledges that burning of retardant eliminates its toxicity.

86. The Avoidance/Attractance Report concludes that, when fish have the opportunity, fish avoid retardant in the water. Even if the fish cannot completely avoid the retardant, the Experimental Streams Report concludes that surviving fish recover rapidly once the exposure to retardant chemicals is stopped.

87. Without an ecological risk assessment to determine whether the toxicity of fire retardant chemicals constitutes a potential hazard, Defendant USFS has no reasonable grounds for deciding to ban wildland fire retardants containing YP Soda.

88. Defendant USFS had no reasonable grounds in April 2000 to support a decision to ban wildland fire retardants containing YP Soda, and Defendant cannot reasonably rely on the 2002 Studies in support of its prior decision to ban YP Soda. The 2002 Studies did not evaluate whether retardants containing YP Soda posed a hazard to threatened or endangered species materially greater than that posed by retardants without YP Soda or by a forest fire fought without use of retardants. The 2002 Studies are not the necessary field studies which would either support or undermine Defendant USFS' prior, unfounded decision to ban fire retardants containing YP Soda.

**USFS DECISION TO PURCHASE ONLY GUM THICKENED RETARDANTS**

89. Defendant USFS also is attempting to preclude purchases of Fire-Trol's liquid concentrate retardant, its most successful, operationally and professionally preferred retardant. Defendant is acting to eliminate Fire-Trol's liquid concentrate retardant by purchasing only retardants containing gum thickener, beginning with the 2005 procurement cycle. Fire-Trol's liquid concentrate retardant does not contain a gum thickener.

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

90. The USFS has not adopted its rule – requiring gum-thickened retardant of at least 100 centipoise viscosity – in accordance with the APA.

91. Defendant USFS has not stated the basis for its rule requiring gum thickener in retardants in any detail. However, it has stated that it needs fire retardants with sufficient elasticity and viscosity to be dropped from higher altitudes and to allow sufficient retardant to reach the target to be effective. If the USFS had adopted its rule in accordance with the notice and comment requirements of the APA, the basis for its decision would have been disclosed, and errors or oversights identified.

92. Even if Defendant USFS were to comply with the APA notice and comment requirements, the USFS' decision to purchase only gum-thickened retardants would be arbitrary and capricious and unsupported by the evidence because, as Plaintiff Fire-Trol is informed and believes and thereon alleges,

(a) the USFS has an insufficient basis for concluding that gum thickener is the only ingredient in retardant which can provide sufficient viscosity and elasticity to meet the USFS' needs;

(b) the USFS has an insufficient basis for concluding that the optimal altitude from which to drop Fire-Trol's retardants without gum thickener is any different from, or safer than, the optimal altitude from which a 100 centipoise, gum-thickened retardant would be dropped;

(c) Fire-Trol retardants without gum thickener are effectively dropped from altitudes deemed safe by the USFS. Increasing the altitude from which retardant is dropped decreases the accuracy of the drop, making gaps in the fire line more likely; and

(d) the USFS has not measured the effectiveness of the retardant to impede wildland fires when dropped on a three-dimensional "fuel load," but only the volume and distribution pattern of retardant reaching the ground in a two-dimensional designated area.

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

93. In its June 1, 2000 letter, the USFS announced that it would "only accept bids for gum-thickened products in the year 2004 contracts." The USFS reiterated its rule that it would no longer purchase wildland fire retardants without gum thickener in several other letters following its June 1 letter, including but not limited to letters dated January 31, 2002; May 26, 2002; July 19, 2002 (stating that the USFS "intends to **continue its position** that . . . it will accept only retardants containing gum-thickeners.") (emphasis added); and August 2, 2002 (stating that the USFS "has not changed its position of accepting only gum-thickened products.").

94. In the USFS' October 4, 2002 letter, the USFS reiterated its rule that it would accept only products containing gum thickener. To be consistent with its decision to implement the rule banning YP Soda beginning in 2005, the USFS agreed to defer implementing the rule requiring gum thickener until the 2005 procurement as well.

95. Plaintiff is informed and believes and thereon alleges that Defendant USFS announced its rule that it would only purchase gum-thickened retardants without first determining whether retardants other than those containing gum thickener provide at least the same benefits as a low viscosity gum-thickened retardant under actual fire fighting conditions.

96. Plaintiff is informed and believes and thereon alleges that the USFS based its decision requiring gum thickener primarily on a comparison between gum-thickened retardants and water or water-like retardants. The characteristics of water, which has a viscosity of 1 centipoise, are materially different from the characteristics of Fire-Trol's liquid concentrate retardants, which contain ammonium polyphosphate.

97. Fire-Trol's liquid concentrate retardant does not use gum thickeners to provide viscosity and elasticity, but its liquid concentrate retardant exhibits an elasticity and a viscosity substantially greater than plain water. Fire-Trol's liquid concentrate retardant is viscous and elastic, similar to low viscosity gum-thickened retardants.

98. With respect to viscosity requirements, in its October 4, 2002 letter, the USFS stated that it would "only accept product for bid in 2005 which contains at least 100

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

[centipoise], which is the amount our research indicates improves drop characteristics." This was the same standard set forth in the USFS' August 2, 2002 letter.

99. Plaintiff Fire-Trol is informed and believes and thereon alleges that Defendant USFS has no documented performance information, reports, or other records supporting its conclusion that viscosity of 100 centipoise materially "improves" wildland fire retardant drop characteristics over Fire-Trol's non-gum-thickened liquid concentrate formulas.

100. In its August 2, 2002 letter, Defendant USFS identifies Shock-Hydrodynamics and Honeywell studies conducted between 1973 and 1980 as a basis for the USFS' determination that gum thickener providing at least 100 centipoise viscosity improves drop characteristics of retardant. However, Plaintiff is informed and believes and thereon alleges that those studies did not evaluate gum-thickened retardant of less than approximately 1200 centipoise.

101. Fire-Trol is unaware of any published study by the USFS which reported or analyzed data relating to the drop characteristics of gum-thickened retardant of approximately 100 centipoise. The only data of which Fire-Trol is aware is either for gum-thickened retardants of substantially higher viscosity than 100 centipoise or for gum-thickened ammonium polyphosphate retardants. Neither type of data establishes the drop characteristics of orthophosphate retardants for which gum thickener provides a viscosity of 100 centipoise.

102. Defendant USFS has not disclosed to Fire-Trol the existence of, or provided to Fire-Trol copies of, any studies establishing the drop characteristics of 100 centipoise, gum-thickened wildland fire retardant. Notwithstanding this apparent lack of scientific basis for its decision, the USFS concluded that only gum-thickened retardants with a viscosity of at least 100 centipoise will provide the (unstated) improved drop characteristics. Because the USFS had no scientific basis for its conclusion, the USFS' rule that it would only purchase gum-thickened wildland fire retardants meeting a threshold of 100 centipoise viscosity is arbitrary and capricious and an abuse of discretion.

103. Defendant USFS stated in its August 2 letter that "it is important to get as much retardant to the ground as possible." To the extent that the USFS made its decision to require gum-thickened retardants based on two-dimensional drop studies considering only how much retardant reaches the ground when unimpeded by forest canopy or other vegetation onto which retardant is dropped, Defendant USFS abused its discretion by acting arbitrarily and capriciously and contrary to the evidence.

104. Wildland fire retardants are dropped on a variety of fuel types, such as trees, bushes, and grass, collectively known as the "fuel structure" or "fuel load."

105. In section 3.14 of USFS specification 5100-304b, the USFS has recognized the need to evaluate the effectiveness of retardant "on a variety of fuel types . . .."

106. The effectiveness of retardant depends on how thoroughly it covers the fuel load with sufficient salts to retard the fire. If the retardant leaves a portion of the fuel load uncoated, then that fuel is free to burn and the retardant may not materially impede the progress of the wildland fire.

107. Gum-thickener interferes with a wildland fire retardant's ability to coat and penetrate the fuel load. The USFS' practice of using an enzyme to break down gum thickener and reduce viscosity prior to conducting the burn test required by specification 5100-304b is an acknowledgment by the USFS that gum thickener may inhibit fuel load coverage and, thus, retardant effectiveness.

108. A 1974 Honeywell study for the USFS, *Extended High Altitude Retardant Drop Mechanization Study*, found that substantially more thickened retardant than unthickened retardant is required to provide the same level of "fuel load coverage." Based on that conclusion, gum-thickened retardants are more costly, because more retardant is required for the same level of protection, and more risky, because more drops are required to deliver the increased volume of retardant, than are unthickened retardants.

109. Based on the *Extended High Altitude Retardant Drop Mechanization Study*, the USFS knows that, even if more thickened retardant than non-gum-thickened retardant

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

were to reach the "ground" or fuel load, thickened retardants provide less fuel load coverage and less effective retardation than non-gum-thickened retardants.

110. Plaintiff Fire-Trol is unaware of any field or operational study which has identified what amount of 100 centipoise, gum-thickened retardant is required to reach total "fuel load coverage."

111. The superior effectiveness of Fire-Trol's non-gum-thickened, liquid concentrate retardant is evidenced by the air attack pilots' preference for the liquid concentrate retardant. A December 15, 2000 letter signed by 117 air attack pilots and other fire fighting personnel, virtually all of the attendees at the National Air Attack meeting and representing over 75 percent of such personnel, stated that ". . . liquid concentrate is the preferred product of choice due to the fact that it is generally more effective in stopping the advancement of fires than the gum-thickened products."

112. The relative effectiveness of Fire-Trol's non-gum-thickened, liquid concentrate retardant to gum-thickened retardants also is evidenced by the fact that, except for two bases testing a different fire retardant, the Canadian government uses Fire-Trol's liquid concentrate retardant exclusively, preferring the operational performance of the liquid concentrate to gum-thickened retardants.

113. Defendant USFS' rule requiring gum thickener arbitrarily denies Fire-Trol the ability to bid its liquid concentrate retardant, which currently accounts for the vast majority of Fire-Trol's sales of wildland fire retardant. Fire-Trol cannot produce for sale to the USFS a gum-thickened version of its liquid concentrate retardant because gum-thickened ammonium polyphosphate liquid concentrate retardants are patented by Astaris. The USFS' rule that it will only purchase gum-thickened retardants of at least 100 centipoise effectuates a monopoly for liquid concentrate wildland fire retardants, contrary to CICA. (*See* 41 U.S.C. §§ 251 *et seq.*)

114. Defendant USFS' decision to purchase only gum-thickened retardants of at least 100 centipoise viscosity is arbitrary and capricious and unsupported by the evidence.

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

**USFS MODIFICATION TO THE QUALIFIED PRODUCTS LIST**

115. Defendant USFS has also exhibited arbitrary and capricious action in attempting informally to "modify" the rigorous testing procedures adopted by the USFS for listing products on the wildland fire retardant QPL and in listing products as fully qualified, rather than "conditionally approved" and subject to field test, when the products have not met existing approved specifications.

116. In its May 26, 2002 letter, Defendant USFS indicated that it would "temporarily institute the procedures outlined in attachment 'A' (Modified Testing Procedures) for the purpose of testing products offered for bid for the 2004 [fire retardant contract]." This constituted the first statement of a change in the USFS' testing protocols and procedures for establishing a QPL of wildland fire retardants meeting the technical requirements of FS Specification 5100-304a or -304b, which were adopted in February, 1986 and January, 2000, respectively.

117. In the attachment to its May 26 letter, the USFS stated that:

> Products that contain one of the prescribed retardant salts or combinations will not require an operational field evaluation although they will be subject of [sic] intensive lot acceptance and quality assurance monitoring.

118. Specification 5100-304b requires operational field evaluation, with the level of evaluation depending on the degree of change between an existing, qualified retardant and the proposed retardant. The standard announced in the May 26 letter purports to give the USFS latitude to exempt from field testing requirements formulations which would be subject to "monitored operational evaluation," "limited operational evaluation," or "full operational evaluation" under the existing specification 5100-304b.

119. "Monitored operational evaluation" is required for products which are similar to fully or conditionally qualified and approved products, do not change the type or amount of ingredients, but which contain alternate source ingredient(s). "Limited operational evaluation" is required when an otherwise approved product has undergone minor changes in type and amount of ingredient(s) and any changes in the color enhancing

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

agent. "Full operational evaluation" is required for new products or significant changes of product type, including those containing new types or amounts of ingredients or new mixing, handling and storage requirements.

120. Under the modified specifications, the USFS has purported to grant itself the authority to list a product as fully qualified on the QPL subject to Targeted "Lot Acceptance Quality Assurance" ("LAQA") monitoring. The Targeted LAQA process under the modified specifications will subject "newly qualified products" only to the "monitored operational evaluation," and purports to grant the USFS discretion to avoid limited or full operational evaluation which may otherwise be required under specification 5100-304b. Ms. Johnson has admitted that the Targeted LAQA procedure is the "monitor level" operational field evaluation under Specification 5100-304b, which the Specification requires to be completed **prior to** a product being listed as fully qualified on the QPL.

121. In the attachment to its May 26 letter, the USFS also stated that a "product containing one of these [listed] prescribed retardant salts or combinations will not require a burn test." The existing specification 5100-304b requires a burn test, without exception.

122. In the past, the USFS has taken the position that burn tests are required for all proposed retardants because ingredients other than salts, such as those ingredients used to increase elasticity or to inhibit corrosion, may change the effectiveness of the retardant. Specifically, in a 1988 study, the USFS concluded that "retardant effectiveness cannot be accurately predicted by analysis of total concentration of active salts, but must be quantified by burning fuels treated with the chemical formulations." (Aylmer D. Blakely, *Flammability Reduction Comparisons of Four Forest Fire Retardants* (US Department of Agriculture, Forest Service, April, 1988).)

123. Fire-Trol is informed and believes and thereon alleges that the USFS' attempts to avoid the mandatory requirement and admitted need for burn testing arises, in part, from its inability to achieve reliable results from its modified burn chamber.

124. On June 10, 2002, Fire-Trol protested the modification of the qualification procedures and inclusion of additional products on the QPL based on the modified

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

procedures. Fire-Trol also protested on the grounds that the USFS' decision to exclude wildland fire retardants containing YP Soda was arbitrary, capricious, and contrary to law. That protest was filed with the GAO.

125. In its July 19, 2002 letter in response to Fire-Trol's protest, Defendant USFS recognized its obligation to comply with statute and regulation in modifying the specifications, QPL, or testing procedures for qualification, stating:

> . . . the Forest Service has determined to take corrective action and withdraw the May 26, 2002, letter. To the extent the May 26, 2002. [sic] letter may be deemed a change to specifications, the Qualified Products List, and testing procedures for qualification, the Forest Service has determined that it will make such changes **after** the Forest Service has complied with applicable portions of the Federal Acquisition Regulation ("FAR"), including Part 9 of the FAR, and any other applicable statutes and regulations.

(Emphasis added.)

126. In the USFS' August 2, 2002 letter formally withdrawing the May 26 letter, the Defendant USFS reiterated that:

> Products that can be bid in the next contract cycle will be those qualified under FS specification 5100-304a, 304b or by the modified qualification process. . . . This modified specification will soon be published through appropriate mechanisms and **after** complying with applicable statutes and regulations.

(Emphasis added.) At the time of this Complaint, this modified specification has not been published for public review and comment in accordance with APA requirements, nor has it been adopted in accordance with applicable statutes and regulations.

127. Contrary to Defendant USFS' representation that it was withdrawing the modified testing procedures, the April 5, 2003 QPL for wildland fire retardants included certain fire retardants as being "fully qualified," subject to Targeted LAQA. Fire-Trol was informed in a telephone conversation with a USFS employee that the modified specifications used to determine that the products were "fully qualified" were a

combination of the modified specifications set forth as an attachment to the May 26 letter and the existing specification 5100-304b.

128. The USFS has never clearly disclosed which "modified specifications" it is using to determine whether a product is listed as fully qualified on the QPL.

129. USFS representatives orally acknowledged that the USFS had not complied with appropriate mechanisms and statutory and regulatory requirements for modifying the testing standards. Further, in at least two telephone conversations in May 2003, counsel for the USFS acknowledged that products on the April 5, 2003 QPL, which were qualified based on modified testing procedures, should not have been included on the list. Counsel for the USFS further advised Fire-Trol that the April 5, 2003 QPL was contrary to the USFS' letter of August 2, 2002 and that USFS personnel had been directed not to make purchases relying on any QPL which was based on the withdrawn May 26, 2002 letter.

130. Notwithstanding Defendant USFS' acknowledgment, the wildland fire retardant QPL continues to list products as fully qualified subject to Targeted LAQA.

131. Based on a letter from the Canadian Interagency Forest Fire Centre dated July 8, 2003, Fire-Trol is informed and believes and thereon alleges that the USFS is taking the position that it has complied with legal requirements for modifying the specifications to allow products to be listed as "fully qualified" when they have not completed the required testing. In response to a comment that Defendant USFS' modified specification had not been legally adopted, that letter states that the USFS "assures us that the Lot Assurance Quality Acceptance [sic] process in place in the US has been formally and officially adopted . . .."

## HARM TO FIRE-TROL

132. Defendant USFS' rules have had an immediate, injurious impact on Fire-Trol. The USFS has been refusing to test Fire-Trol retardants to the existing Specification 5100-304b on the grounds that the Specification, including combustion retarding effectiveness standards, will be changed and the USFS will not be purchasing retardants containing YP Soda or without gum thickener. That refusal to test to the existing

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

standards is preventing Fire-Trol from qualifying additional products that it has incurred the expense to formulate and, in some cases, partially test under Specification 5100-304b.

133. Fire-Trol also has been unfairly compelled to accelerate a multi-year process to develop and qualify new products, and has incurred, and will continue to incur, substantial expenses and personnel time commitments to do so and to respond to unfounded and improper attacks on its presently qualified products, putting it at a competitive disadvantage in the marketplace.

134. Fire-Trol has also been unfairly compelled to enlist the aid of legal, technical and environmental experts in order to educate USFS on the issues of YP Soda and the effectiveness, or lack thereof, of gum thickeners.

135. Fire-Trol also has been harmed by the USFS' failure to adopt a modified specification, if the USFS actually intends to modify Specification 5100-304b. Without a properly adopted modification, Fire-Trol can only guess what standards the USFS might employ in upcoming procurements. Fire-Trol must either test to the existing standards, which the USFS says it will not use and will not test for, or incur the expense to test to some proposed standard which has not been adopted and may be changed before it is adopted.

136. Defendant USFS' arbitrary and capricious decision not to purchase or use wildland fire retardants containing YP Soda also is damaging to the business reputation of Fire-Trol in the United States and in other countries in which Fire-Trol retardants are sold, impacting future contracts and sales. For example, the State of California, which relies on the USFS' wildland fire retardant QPL, has indicated its intent not to purchase wildland fire retardants containing YP Soda.

137. Notwithstanding its efforts, Fire-Trol has, as of the time of this Complaint, been unable to identify another cost-competitive corrosion inhibitor which is environmentally acceptable, which meets the USFS anti-corrosion requirements, and whose commercial use would not be inhibited or prevented by patent laws. Fire-Trol's principal business is the manufacture of fire retardant chemical products for use in

fighting wildland fires, all of which retardants contain YP Soda. Because approximately ninety-five percent of Fire-Trol's total retardant sales are to the USFS and other governmental agencies which rely on the USFS retardant specifications and QPLs, Defendant USFS' arbitrary and capricious decision not to purchase fire retardants containing YP Soda threatens Fire-Trol's very existence. Defendant's rule, if it is not enjoined, will put Fire-Trol out of business and create a monopoly for fire retardant in the United States in the sole remaining retardant manufacturer.

138. In a draft "Predecisional Memorandum" regarding lifting the Stop Work Order, Defendant USFS acknowledged that failing to lift the ban on USFS purchases of wildland fire retardant containing YP Soda would have resulted in Fire-Trol going "bankrupt."

139. Similarly, Fire-Trol will suffer severe harm from the USFS' decision to purchase only gum-thickened retardants. Approximately 75 percent of Fire-Trol's annual income arises from sales of its liquid concentrate retardant, which does not contain a gum thickener. Defendant USFS' arbitrary and capricious decision to purchase only fire retardants containing a gum thickener threatens Fire-Trol's very existence. Defendant's rule requiring gum thickener, if it is not enjoined, is likely to put Fire-Trol out of business and therefore create a monopoly for fire retardant in the United States in the sole remaining retardant manufacturer.

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

**CLAIM I**

**(Injunctive Relief, 5 U.S.C. § 706)**

140. Plaintiff realleges and incorporates herein by reference paragraphs 1 through 139, above.

141. Plaintiff seeks preliminary and permanent injunctive relief preventing the USFS from implementing its rules banning YP Soda and requiring a gum thickener in retardants beginning with the 2005 contract cycle.

142. Plaintiff Fire-Trol has no adequate remedy at law to prevent the destruction of its business from the Defendant USFS' arbitrary and capricious actions.

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

143. Under 5 U.S.C. section 706, the court has the authority to "compel agency action unlawfully withheld or unreasonably delayed." Section 706 also grants the court the authority to "hold unlawful and set aside agency action, findings, and conclusions" which are 1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 2) "in excess of statutory jurisdiction, authority, or limitations," or 3) "without observance of procedure required by law."

144. An agency may employ "qualification requirements" in a solicitation if the agency complies with statutory and regulatory procedures in adopting such requirements. "Qualification requirements" – requirements for testing or quality assurance that must be completed before award of a contract – are addressed in 41 U.S.C. section 253c and Federal Acquisition Regulation ("FAR") Part 9, subpart 2.

145. Before enforcing a qualification requirement, section 253c(b) and FAR section 9.202(a)(1) require the head of the procuring agency to:

> (1) prepare a written justification stating the necessity for establishing the qualification requirement and specify why the qualification requirement must be demonstrated before contract award;
>
> (2) specify in writing and make available to a potential offeror upon request all requirements which a prospective offeror, or its product, must satisfy in order to become qualified, such requirements to be limited to those least restrictive to meet the purposes necessitating the establishment of the qualification requirement;
>
> (3) specify an estimate of the costs of testing and evaluation likely to be incurred by a potential offeror in order to become qualified;
>
> (4) ensure that a potential offeror is provided, upon request, a prompt opportunity to demonstrate at its own expenses (except as provided in subsection (d)) its ability to meet the standards specified for qualification using qualified personnel and facilities of the agency concerned or of another agency obtained through interagency agreement, or under contract, or other methods approved by the agency (including use of approved testing and evaluation services not provided under contract to the agency);
>
> (5) if testing and evaluation services are provided under contract to the agency for the purposes of clause (4), provide

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

> to the extent possible that such services be provided by a contractor who is not expected to benefit from an absence of additional qualified sources and who shall be required in such contract to adhere to any restriction on technical data asserted by the potential offeror seeking qualification; and
> (6) ensure that a potential offeror seeking qualification is promptly informed as to whether qualification is attained and, in the event qualification is not attained, is promptly furnished specific information why qualification was not attained.

146. Generally, qualification is performed in advance of any specific solicitation procedure. (FAR § 9.203(a).) Instructions concerning qualification are found in the Federal Standardization Manual ("FSM"). (*Id.*, § 9.203(b) and (c).) Those products which pass qualification testing, including field testing where required by regulation, are enumerated on a QPL and are the only acceptable products in response to a bid solicitation using that QPL.

147. Where possible, procuring agencies must give bidders sufficient time to qualify products prior to award of a contract subject to qualification requirements. (FAR § 9.205(a).)

148. When initiating a qualification requirement, the agency must furnish notice of the intent to establish a qualification requirement, including, among other things, the "anticipated date that the agency will begin awarding contracts subject to the qualification requirement." (FAR § 9.205(a).)

149. In procurements involving qualification requirements, the contracting officer must use presolicitation notices ". . . to advise potential suppliers before issuing solicitations involving qualification requirements." (FAR, § 9.206-1(e)(1).) The contracting officer must also "[a]llow the maximum time, consistent with delivery requirements, between issuing the solicitation and the contract award." (*Id.*)

150. Fire-Trol is informed and believes and thereon alleges that the USFS intends to use qualification requirements in the upcoming 2005 procurement. The only wildland fire retardant QPL of which Fire-Trol is aware is that based on Specification 5100-304b.

Fire-Trol is unaware of any other qualification requirement adopted by the USFS, or modification to the 5100-304b qualification requirement legally adopted by the USFS.

151. Although Defendant USFS' August 2, 2002 letter expressed its intent to allow products to be bid using "the modified qualification process," the USFS never adopted that modified specification in compliance with applicable statutes and regulations, so any qualification requirements in the modified specification are inapplicable at this time.

152. Plaintiff is informed and believes and thereon alleges that Defendant USFS has not prepared a written justification of the necessity for establishing a new QPL for fire retardants that a) prohibits YP Soda, b) requires gum thickeners, and/or c) provides for modified qualification procedures. Fire-Trol has repeatedly contacted the USFS regarding this issue. USFS representatives have indicated that no such written justification has been prepared, and Fire-Trol has not been provided with any such justification.

153. Notwithstanding its failure to prepare a justification for a new QPL, Defendant USFS has decided and unequivocally stated its rule that it will cease purchasing fire retardant products containing YP Soda and will require gum thickener in wildland fire retardants beginning with the 2005 procurement cycle. Defendant USFS has also begun listing products on the QPL in accordance with the modified testing procedures which have not been adopted in accordance with legal requirements.

154. Because of the length of time required to test a proposed wildland fire retardant for safety and efficacy in compliance with the specifications, Defendant USFS has not initiated the qualification process for a new QPL with sufficient time to test and qualify products prior to the 2005 procurement cycle.

155. Defendant USFS' decision not to purchase fire retardants containing YP Soda constitutes a rule – an agency statement of general or particular applicability designed to implement, interpret, or prescribe law or policy – within the meaning of 5 U.S.C. section 551. Similarly, Defendant's decision to modify the qualification

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

requirements (Specification 5100-304b) constitutes a rule within the meaning of 5 U.S.C. section 551.

156. The Department of Agriculture has expressly elected to be governed by the requirements of the 5 U.S.C. section 553 (b) and (c) and waived any exception that might otherwise apply.

157. Defendant USFS' rulemaking decisions were not promulgated in accordance with 5 U.S.C. section 553, which requires published notice of the proposed rulemaking and an opportunity for interested persons to comment on the proposed rule. Plaintiff is informed and believes and thereon alleges that Defendant has not prepared even the notice of its rulemaking, as required by the APA.

158. Defendant USFS' failure to promulgate its final decisions through a notice and comment rulemaking proceeding is arbitrary and capricious, an abuse of discretion, contrary to law, and without observance of procedure required by law, within the meaning of the Administrative Procedure Act.

159. Defendant USFS should be enjoined from excluding wildland fire retardants containing YP Soda from any procurement unless and until Defendant fully and fairly complies with the requirements of 5 U.S.C. section 553, 41 U.S.C. section 253c and FAR, Part 9, subpart 2.

160. Defendant USFS should be enjoined from requiring that fire retardants contain gum thickener unless and until Defendant fully and fairly complies with the requirements of 5 U.S.C. section 553, 41 U.S.C. section 253c and FAR, Part 9, subpart 2.

161. Defendant USFS should be enjoined from including any fire retardant on the Qualified Products List for fire retardant chemicals that has not satisfied the testing requirements in USFS Specification 5100-304b and the applicable testing protocols, unless and until Defendant complies with the requirements of 5 U.S.C. section 553, 41 U.S.C. section 253c and FAR, Part 9, subpart 2.

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

## CLAIM II

### (Declaratory Relief, 28 U.S.C. § 2201; CICA, 41 U.S.C. § 251 *et seq.*)

162. Plaintiff realleges and incorporates herein by reference paragraphs 1 through 139, above.

163. Except under limited exceptions not applicable herein, in conducting a contract procurement, CICA requires an executive agency of the federal government to obtain "full and open competition" using competitive procedures. (*See* 41 U.S.C. §§ 253, 253a.)

164. Consistent with the statutory requirement for full and open competition, under the FSM, "[p]rior to inclusion of a requirement for qualification in a specification, the preparing activity will determine [that] . . . [a]t least two or more sources are available and willing to submit their products for qualification, except under unusual circumstances." (FSM, Ch. 6, Pt.1, ¶ 5 (2000).)

165. Before qualification is established, the government must have "a reasonable expectation that the product will be available in sufficient quantities from several sources to meet government requirements." (*Id.*, ¶ 6(a).)

166. Under 41 U.S.C. section 253(c)(1), if there is only one responsible source of a product, an agency may only award a contract using non-competitive procedures if "no other type of property . . . will satisfy the needs of the executive agency."

167. Defendant USFS may not adopt a qualification requirement or regulation relating to wildland fire retardants which excludes products containing YP Soda, because such a restriction would, by government action, limit the possible suppliers to one manufacturer and would not result in "[a]t least two or more sources [being] available." Similarly, the USFS may not issue a solicitation for wildland fire retardants which excludes products containing YP Soda because such a limitation would, by government action, limit the procurement to one manufacturer and would not support "a reasonable expectation that the product will be available in sufficient quantities from several sources to meet government requirements." Excluding wildland fire retardants containing YP

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

Soda, which have satisfied the needs of the USFS for 30 years, restricts, rather than promotes, full and open competition for fire retardants.

168. Defendant USFS may not adopt a qualification requirement or regulation relating to wildland fire retardants which requires that products contain gum thickener, because such a restriction would, by government action, effectively limit the possible suppliers to one manufacturer and would not result in at least two or more sources actually being available to supply retardant.

169. Defendant USFS may not restrict its purchases of wildland fire retardants to those containing a gum thickener because such a restriction would not promote full and open competition for fire retardants. Defendant has expressed that its need is for fire retardants with sufficient elasticity and viscosity that they may be dropped from at least the minimum safe altitudes and allow sufficient retardant to reach the "ground" (fuel load) to be effective. Defendant cannot establish any material benefit from purchasing gum-thickened wildland fire retardants with a viscosity of 100 centipoise over Fire-Trol liquid concentrate retardants. Defendant USFS cannot establish that no other product, other than gum-thickened retardant of at least 100 centipoise viscosity, will meet the needs of the agency.

170. In CICA, Congress required agencies to "obtain full and open competition through the use of competitive procedures in accordance with the requirements of this title and the Federal Acquisition Regulation." (41 U.S.C. § 253(a)(1)(A).) CICA was adopted in response to sole-source or non-competitive contract awards for the purpose of dictating greater use of fair, competitive bidding procedures. Excluding an otherwise qualified competitor based on scientifically unsupported concerns or hypothetical fears of uneducated public or political reaction is inconsistent with the CICA goals.

171. An actual controversy exists in that Defendant USFS has repeatedly stated its intent not to purchase wildland fire retardants containing YP Soda and its intent to purchase only gum-thickened retardants, either of which would substantially limit

procurements of fire retardant and could destroy Fire-Trol as a competitor in the wildland fire retardant field.

172. Fire-Trol seeks a declaration that Defendant USFS cannot, consistent with the statutory requirement for full and open competition, establish a qualification requirement or regulation that excludes fire retardants containing YP Soda unless and until Defendant can identify adequate competition in the wildland fire retardant market and a sufficient scientific basis for excluding retardants containing YP Soda.

173. Fire-Trol further seeks a declaration that Defendant USFS cannot, consistent with the statutory requirement for full and open competition, limit its procurement to gum-thickened retardant unless and until Defendant can identify adequate competition in the wildland fire retardant market and a sufficient scientific basis for concluding that no product other than a gum-thickened fire retardant of at least 100 centipoise viscosity meets identified and demonstrated needs of the agency.

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

**CLAIM III**

**(Declaratory Relief, 28 U.S.C. § 2201; APA, 5 U.S.C. §706)**

174. Plaintiff realleges and incorporates herein by reference paragraphs 1 through 139, above.

175. Under 5 U.S.C. section 706, Defendant USFS' actions in adopting rules that Defendant will no longer purchase fire retardants containing YP Soda and will only purchase retardants containing a gum thickener are unlawful, and must be set aside as arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law or procedure.

176. Under 5 U.S.C. section 706, Defendant USFS' modification to the specifications for testing and qualification for the wildland fire retardant QPL is unlawful, and must be set aside as arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law or procedure.

177. Defendant USFS' decisions to adopt rules prohibiting the use of YP Soda in wildland fire retardant, requiring use of gum thickeners resulting in a minimum 100

centipoise viscosity wildland fire retardant, and modifying existing testing and qualification procedures are arbitrary and capricious and contrary to 5 U.S.C. section 553 because:

(a) Defendant USFS failed to publish notice of its proposed rulemaking in the Federal Register or to otherwise provide legal notice of the time, place, and nature of public rulemaking proceedings or the authority for the rules;

(b) Defendant USFS failed to give interested persons, including retardant manufacturers, fire fighting personnel, environmentalists, landowners, and others, an opportunity to participate in the rule making through submission of written data, views, or arguments;

(c) To the extent Fire-Trol informally has provided substantial information which weighs against the rules adopted by Defendant USFS, the USFS failed to consider the substantial relevant matter presented by Fire-Trol.

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

178. Defendant USFS' rule prohibiting the use of YP Soda in wildland fire retardant is arbitrary and capricious and an abuse of discretion because:

(a) it is based on the USGS 2000 Study, which recommended validation of its laboratory findings in field testing and which Defendant USFS has expressly acknowledged is not representative of field conditions;

(b) it was made in May 2000, prior to completion of field studies that Defendant USFS committed to perform in their April 20, 2000 letter;

(c) historical data reflects that wildland fire retardants are very rarely dropped directly into surface waters therefore minimizing, if not eliminating, the potential risk to the environment;

(d) Defendant USFS has no basis for concluding that toxic amounts of YP Soda actually reach surface waters through runoff, and at least one study concludes to the contrary;

(e) Defendant USFS has not conducted an ecological risk assessment of the effects of YP Soda as a component of retardants which evaluates the

numerous mitigating factors that affect whether YP Soda in wildland fire retardants poses an actual hazard to aquatic species;

(f) Defendant USFS has expressly recognized i) that fire retardant chemical products containing YP Soda do not pose significant environmental hazards when the USFS properly applied the products according to the USFS *Guidelines*, ii) that use of such products by the USFS does not violate the Clean Water Act or other federal environmental laws, and iii) that there is no evidence, when the USFS properly applies the products according to the USFS *Guidelines*, that the products have caused loss of fish or other aquatic life;

(g) Defendant USFS has sole and complete control over how and where it applies the wildland fire retardant chemicals it purchases;

(h) If the fire retardant chemical is improperly applied, Defendant USFS has expressly acknowledged that ammonia in wildland fire retardants poses ecological hazards to aquatic species, and is the primary toxic constituent in wildland fire retardant. Defendant has not banned the use of fire retardant products containing ammonia; and

(i) Defendant USFS has not banned the use of YP Soda-containing road de-icing salts on USFS managed lands. The use by Defendant of road de-icing salt affects many more acres of forestland than wildland fire retardants, and road de-icing salt is applied in such a way that it is more likely that YP Soda from the road salts will enter into surface waters.

179. Defendant USFS' decision to implement a rule requiring that wildland fire retardant contain a gum thickener and demonstrate a minimum of 100 centipoise viscosity is arbitrary and capricious and an abuse of discretion because:

(a) the USFS has an insufficient basis for concluding that gum thickener is the only ingredient in retardant which can provide sufficient viscosity and elasticity to meet the USFS' needs;





LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

(b) the USFS has an insufficient basis for concluding that the optimal altitude from which to drop Fire-Trol's retardants without gum thickener is any different from, or lower than, the optimal altitude from which a 100 centipoise, gum-thickened retardant would be dropped;

(c) Fire-Trol retardants without gum thickener are effectively dropped from altitudes deemed safe by the USFS. Increasing the altitude from which retardant is dropped decreases the accuracy of the drop, making gaps in the fire line more likely; and

(d) the USFS has not measured the effectiveness of the retardant to impede wildland fires when dropped on a three-dimensional "fuel load," but only the volume and distribution pattern of retardant reaching the ground in a two-dimensional designated area.

180. Defendant USFS knew or should have known that its decision to institute a rule banning YP Soda was arbitrary and capricious and contrary to the evidence as identified by Fire-Trol in written and oral communications by Defendant USFS' counsel, employees, agents, and experts, and based on the USGS 2000 Study which expressly stated that field tests were required to validate the results of the lab study.

181. Defendant USFS knew or should have known that its decision to institute a rule requiring gum thickener was arbitrary and capricious and contrary to the evidence. The USFS was aware that 1) wildland fire retardants containing ammonium polyphosphate exhibit visco-elastic properties and provide the performance characteristics sought by the USFS, and 2) gum thickened products are generally less effective at stopping the advancement of fires than Fire-Trol's liquid concentrate.

182. Defendant USFS knew that its adoption of modified specifications was arbitrary and capricious and contrary to law, as evidenced by admissions made by USFS representatives to Fire-Trol representatives and the USFS' commitment to GAO that the "modified specification will soon be published through appropriate mechanisms and after complying with applicable statutes and regulations."

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

183. Fire-Trol has been and continues to be harmed by Defendant USFS' rules banning YP Soda and requiring gum thickeners.

184. Fire-Trol is entitled to declaratory relief establishing that Defendant USFS' rule banning YP Soda in fire retardants, the USFS' rule requiring gum thickener in fire retardants, and the USFS' modification to the qualification and testing specifications were arbitrary and capricious based on the information before Defendant at the time the decisions were made.

**PRAYER FOR RELIEF**

Therefore, Plaintiff prays that this Court:

1. Preliminarily and permanently enjoin the USFS from excluding fire retardants containing YP Soda from any procurement unless and until the USFS complies with the requirements of 5 U.S.C. section 553, 41 U.S.C. section 253c and FAR, Part 9, subpart 2;

2. Preliminarily and permanently enjoin the USFS from requiring that fire retardants contain gum thickeners and have a minimum viscosity of 100 centipoise unless and until the USFS complies with the requirements of 5 U.S.C. section 553, 41 U.S.C. section 253c and FAR, Part 9, subpart 2;

3. Preliminarily and permanently enjoin the USFS from including any fire retardant on the Qualified Products List for fire retardant chemicals that has not complied with the testing requirements in Specification 5100-304b and USFS Document 9951-1083 SDTDC as applicable to the January 2000 effective date of the Specification unless and until the USFS complies with the requirements of 5 U.S.C. section 553, 41 U.S.C. section 253c and FAR, Part 9, subpart 2;

4. Declare that the USFS cannot, consistent with the statutory requirement for full and open competition, establish a qualification requirement or regulation that excludes fire retardants containing YP Soda unless and until the USFS can identify adequate competition in the wildland fire retardant market and a sufficient scientific basis for excluding retardants containing YP Soda;

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

5. Declare that the USFS cannot, consistent with the statutory requirement for full and open competition, establish a qualification requirement or regulation that limits wildland fire retardants to those incorporating gum-thickener and measuring a minimum of 100 centipoise viscosity unless and until the USFS a) can identify adequate competition in the wildland fire retardant market, b) develops and adopts specifications setting forth the salient "drop" or other characteristics for comparison of non-gum-thickened retardants against gum thickened retardants and c) can establish a sufficient scientific basis for concluding that no product other than a gum-thickened fire retardant of at least 100 centipoise viscosity meets identified and demonstrated needs of the agency;

6. Declare that the USFS has acted arbitrarily and capriciously and contrary to 5 U.S.C. section 553 in failing to provide notice, meaningful opportunity to comment, and consideration of comments in connection with Defendant USFS' decision to adopt a rule prohibiting the use of YP Soda in wildland fire retardant;

7. Declare that the USFS has acted arbitrarily and capriciously and contrary to 5 U.S.C. section 553 in failing to provide notice, meaningful opportunity to comment, and consideration of comments in connection with Defendant USFS' decision to adopt a rule limiting wildland fire retardant purchases to retardants containing gum thickeners with a minimum 100 centipoise viscosity;

8. Declare that the USFS has acted arbitrarily and capriciously and contrary to 5 U.S.C. section 553 in failing to provide notice, meaningful opportunity to comment, and consideration of comments in connection with Defendant USFS' modification of existing testing and qualification procedures;

9. Declare that the USFS has acted arbitrarily and capriciously and has abused its discretion by adopting a rule banning YP Soda in wildland fire retardants without a) completing adequate field studies prior to implementing its ban on YP Soda, b) completing a risk assessment to determine whether any toxicity identified actually poses a hazard to aquatic environments and/or c) addressing the inconsistencies of its position

arising from its failure to ban ammonia in retardants and its failure to ban YP Soda in road salts;

10. Declare that Defendant USFS has acted arbitrarily and capriciously and has abused its discretion when it adopted the rule requiring that wildland fire retardant contain a gum thickener and demonstrate a minimum of 100 centipoise viscosity without a sufficient basis for concluding that 100 centipoise, gum-thickened wildland fire retardant provides a material benefit over any other viscous and elastic to a wildland fire retardant;

11. Declare that the USFS' rule prohibiting the use of YP Soda in fire retardant chemical products used to fight forest fires is invalid, arbitrary and capricious, an abuse of discretion and contrary to law;

12. Declare that the USFS' rule requiring the use of gum thickeners in fire retardant chemical products and requiring a minimum 100 centipoise viscosity is invalid, arbitrary and capricious, an abuse of discretion and contrary to law; and

13. For such other relief as the Court may deem appropriate.

DATED: August 26, 2004

LAW OFFICES OF PAUL F. DAUER
Paul F. Dauer, Attorney of Record

By: [signature]
JENNIFER L. MCCREADY
Attorney for Plaintiff Fire-Trol Holdings, LLC

Telephone: (916) 448-2431
Facsimile: (916) 448-2462

SACRAMENTO\JDM\9409.3

LAW OFFICES OF
BEST BEST & KRIEGER LLP
400 CAPITOL MALL, SUITE 1650
SACRAMENTO, CALIFORNIA 95814

EXHIBIT "A"

X FILED ___ LODGED
X RECEIVED ___ COPY
AUG 13 2004
CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY ______ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Fire-Trol Holdings L.L.C., Plaintiff, vs. U.S. Department of Agriculture Forest Service, Defendant. | No. CV-03-2039-PHX-JAT **ORDER RE MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION** |

Pending before the Court is Defendant U.S. Department of Agriculture Forest Service's (the "Forest Service") Motion to Dismiss for Lack of Subject Matter Jurisdiction. (Doc. #15.) Plaintiff Fire-Trol Holdings L.L.C. ("Fire-Trol") filed a timely response (Doc. #17) and Defendant filed a timely reply (Doc. #20). For the following reasons the Forest Service's Motion to Dismiss will be granted.

**BACKGROUND**

Plaintiff Fire-Trol is the leading manufacturer of fire retardant chemical products used to fight wildfires in the United States, Canada, and Europe. (Doc. #1 at 2.) It is one of only two manufacturers of wildfire retardant approved for use in the United States. (*Id.*) Defendant Forest Service is an agency of the United States Department of Agriculture with the responsibility for managing public lands in national forests and grasslands. (*Id.*) As part

23

of its responsibilities, the Forest Service provides for fire protection which includes contracting for and applying fire retardant products to facilitate fighting wildfires. (*Id.*)

The Forest Service conducts competitive procurements to award fire retardant contracts. (*Id.*) Traditionally, contracts have been awarded for one year terms with two one year extension options. (*Id.*) The Forest Service awards two contracts for each firebase, one for purchase of bulk retardant, and one for retardant delivered mixed and loaded. (*Id.*) The current fire retardant contracts expire in early 2004, and the Forest Service is expected to issue the solicitation for 2004 through 2006 contracts in the fall of 2004. (Doc. #1 at 4.)

To conduct its procurement of fire retardant, the Forest Service uses a qualified products list ("QPL"). (Doc. #1 at 3.) A QPL is a list of products which have been thoroughly examined, tested in accordance with established protocols, and found to comply with the government's standard specification requirements. (*Id.*) All fire retardant products currently listed on the QPL contain one or more corrosion inhibitors. (Doc. #1 at 4.) Without incorporation of corrosion inhibitors in retardants, significant structural damage would occur to vital parts of tanker aircraft and other equipment used in fighting wildfires. (*Id.*)

Sodium ferrocyanide ("YP Soda") is one such corrosion inhibitor used in fire retardants. (*Id.*) Fire-Trol uses YP Soda as the corrosion inhibitor in all of its fire retardants which meet Forest Service specifications. (*Id.*) On March 28, 2000, the Forest Service issued an Order to Suspend Work (the "Order") to Fire-Trol, halting its purchases of fire retardant from Fire-Trol under the existing contracts. (Doc. #1 at 8.) The Order was prompted by Forest Service concerns over the impact of YP Soda on employees, the public, and the environment. (Doc. #1 at 9.) On April 20, 2000, the Forest Service revoked the Order. (Doc. #1 at 11.) However, one month later the Forest Service sent a letter to Fire-Trol informing them of a May 26, 2000 decision to refrain from purchasing any fire retardants containing YP Soda beginning with the 2004 through 2006 contract cycle. (*Id.*) The letter also announced that the Forest Service would only accept bids for gum-thickened products in the 2004 contracts. (Doc. #1 at 22.) On October 4, 2002, the Forest Service sent a letter to Fire-

Trol informing them that the rule banning YP Soda and requiring gum thickener would not be implemented until 2005. (Doc. #1 at 13, 22.) Fire-Trol claims the Forest Service made these decisions without complying with public notice and open competition requirements. (Doc. #1 at 35, 36.) Fire-Trol also claims the decisions by the Forest Service have put it at a competitive disadvantage and damaged its business reputation. (Doc. #1 at 31.) Finally, they claim that if the Forest Service's decision is not enjoined they will be forced out of business and a monopoly for fire retardant in the U.S. will be created in the sole remaining retardant manufacturer. (*Id.*)

Fire-Trol's Complaint (Doc. #1) against the Forest Service, filed on October 21, 2003, puts forward three claims for relief. The first two claims are for injunctive relief and declaratory judgement, respectively, under the Administrative Procedures Act ("APA") (5 U.S.C. § 706). The final claim is for declaratory judgment under the Competition In Contracting Act ("CICA") (41 U.S.C. § 251 *et seq.*).[1] The Forest Service subsequently filed its Motion to Dismiss for Lack of Subject Matter Jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

**LEGAL STANDARD**

"The party asserting jurisdiction has the burden of proving all jurisdictional facts." *Indus. Tectonics, Inc. v. Aero Alloy*, 912 F.2d 1090, 1092 (9th Cir. 1990) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)). In effect, the court presumes lack of jurisdiction until the plaintiff proves otherwise. *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989). A Rule 12(b)(1) motion to dismiss "for lack of subject matter jurisdiction may either attack the allegations of the complaint or may be made as a 'speaking motion' attacking the existence of subject matter jurisdiction in fact." *Thornhill Publ'g Co. v. Gen. Tel. & Elecs.*, 594 F.2d 730, 733 (9th Cir. 1979).

---

[1] In Claims II, and III, Fire-Trol seeks declaratory relief under 28 U.S.C. § 2201 in conjunction with the APA and the CICA. 28 U.S.C. § 2201 does not itself confer subject-matter jurisdiction. *Fidelity & Cas. Co. v. Reserve Ins. Co.*, 596 F.2d 914, 916 (9th Cir. 1979).

In resolving the former motion, a "facial attack" under Rule 12(b)(1), the district court must accept the allegations of the complaint as true. *White v. Lee*, 227 F.3d 1214, 1241 (9th Cir. 2000). Unlike a Rule 12(b)(6) motion, however, the court will not reasonably infer allegations sufficient to support federal subject matter jurisdiction, rather a plaintiff must affirmatively allege such jurisdiction.

In resolving a "speaking motion" or "factual attack" under Rule 12(b)(1), the court is not limited to the allegations in the pleadings if the jurisdictional issue is separable from the merits of the case. *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987). Instead, the court may view evidence outside the record, and no presumptive truthfulness is due to the complaint's allegations that bear on the subject matter jurisdiction of the court. *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983). Indeed, "the district court is [] free to hear evidence regarding jurisdiction and to rule on that issue prior to trial, resolving factual disputes where necessary." *Id.* However, if the court resolves a Rule 12(b)(1) motion on declarations alone without an evidentiary hearing, it must accept the complaint's factual allegations as true. *McLachlan v. Bell*, 261 F.3d 908, 909 (9th Cir. 2001).

**DISCUSSION**

In its Motion to Dismiss the Forest Service argues that Fire-Trol's claims are actually a "procurement bid protest" arising under the Administrative Dispute Resolution Act of 1996, 28 U.S.C. §1491(b) ("ADRA"), and that the ADRA preempts all procurement protests. (Doc. #15 at 3.) The Forest Service urges that the Court of Federal Claims now has exclusive jurisdiction over suits filed under the ADRA, after a sunset provision went into effect on January 1, 2001. (Doc. #15 at 4.)

In its objection to the Forest Service's motion, Fire-Trol asserts that its lawsuit is not a "procurement bid protest", but is a dispute over a "rule" promulgated by the Forest Service and is properly brought before the Court under the APA and the CICA.[2] (Doc. #17 at 2.)

---

[2] A right of judicial review of agency actions is provided under the APA in 5 U.S.C. § 702, which provides in relevant part, "A person suffering legal wrong because of agency

They contend that the Court has jurisdiction under 28 U.S.C. § 1331 because both the APA and CICA are laws of the United States.[3] (Doc. #17 at 1.)

The Court notes that this Motion to Dismiss for Lack of Subject Matter Jurisdiction is a facial, rather than a substantive attack. Therefore, the Court must accept the allegations of the complaint as true. *See White*, 227 F.3d at 1241. Additionally, Fire-Trol attached declarations and other documents to its Objection to the Motion to Dismiss. Because the Motion hinges on questions of law, the attachments are unnecessary for the Court to rule.

The parties do not disagree about the facts pertaining to jurisdiction. The issues are purely legal: (1) whether Fire-Trol's action is a bid or procurement protest under the ADRA; (2) if it is a bid or procurement protest, may the Court still exercise jurisdiction under the APA in conjunction with 28 U.S.C. § 1331; (3) whether the Court can exercise jurisdiction over this action under the APA if the Forest Service established a rule; and (4) if it is a bid or procurement protest, may the Court exercise jurisdiction under the CICA in conjunction with 28 U.S.C. § 1331.

**I. Whether Fire-Trol's Action is a Bid or Procurement Protest Under the ADRA.**

The ADRA reads in pertinent part:

> Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1). Initially, the ADRA granted jurisdiction to both the United States Court of Federal Claims and the Untied States District Courts. However, Congress included a sunset clause that terminated the jurisdiction of the district courts on January 1, 2001. *See* Pub.L. No. 104-320, § 12(d), 110 Stat. at 3875. The Court of Federal Claims now

---

action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

[3] 28 U.S.C. § 1331 states that, "The district courts shall have jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

has exclusive jurisdiction over any cases filed after that date. *See Id.* This action was filed on October 21, 2003. Therefore, if this is an action in which the ADRA applies, jurisdiction lies exclusively in the Court of Federal Claims.

The Forest Service argues that this is an action covered by the ADRA because it has merely made a procurement decision that it will not procure for government use wildland fire retardants that contain YP Soda or retardants that do not contain gum thickeners. It contends that when a Federal agency determines its own procurement requirements prior to issuing government contract solicitations, that is not a "rulemaking" under the APA.

In its Complaint, Fire-Trol alleges that the Forest Service failed to comply with the requirements of 5 U.S.C. § 553, 41 U.S.C. § 253(c), and Federal Acquisition Regulation ("FAR") Part 9, subpart 2.06-1(e)(1).[4] If Fire-Trol has alleged a violation of a statute or regulation in connection with a procurement or proposed procurement, then the claim is covered by the ADRA. The operative phrase "in connection with" is very sweeping in scope. *Ramcor Services Group, Inc. v. U.S.*, 185 F.3d 1286, 1289, (Fed. Cir. 1999). As long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction. *Id.* This reasoning applies with equal force to alleged violations of regulations. *ES-KO, Inc. v. U.S.*, 44 Fed. Cl. 429, 432 (1999). The contested actions and decisions by the Forest Service are directly connected to its proposed procurement of fire retardant. Each of the statutes and the regulation, if applicable, would significantly affect the process leading up to the 2005 procurement and possibly the ultimate award. The Court has little difficulty concluding that the statutes and regulations at issue in this case are "in connection with a proposed procurement". It is also important to note that the subchapter containing 41 U.S.C. § 253(c) is entitled "Procurement Provisions", and FAR part 9, subpart 2.06-1(e)(1) specifically refers to "acquisitions" made by contracting officers.

---

[4] 5 U.S.C. § 553 establishes administrative procedures for issuing public notices of administrative rule making, 41 U.S.C. § 253(c) establishes competition procedures in conducting procurements, and FAR 9.206-1(e)(1) establishes the required actions by a contracting officer in acquisitions subject to a qualification requirement.

Because Fire-Trol has alleged the violation of a statute or regulation in connection with a procurement or proposed procurement, judicial review is appropriate under the ADRA. However, because of the sunset clause that terminated the jurisdiction of the district courts on January 1, 2001, the Court no longer has jurisdiction over Fire-Trol's claims.

**II. Whether the District Courts have Retained Any Jurisdiction Over Procurement Protests Under the APA.**

Fire-Trol urges that the Court has jurisdiction over its APA claims. It cites *Califano v. Sanders*, 430 U.S. 99, 105 (1977), for the proposition that it is well established that district courts have jurisdiction over APA claims pursuant to 28 U.S.C. § 1331. There is little doubt that the Court would have had jurisdiction over an APA action by Fire-Trol under the *Scanwell* doctrine prior to enactment of the ADRA. The D.C. Circuit in *Scanwell Laboratories v. Shaffer*, 424 F.2d 859 (D.C. Cir. 1970), held that the district courts have jurisdiction over bid protests under the APA. However, case law analyzing the ADRA's legislative history makes it clear that Congress intended that the ADRA would "subsume" any causes of action in the realm of procurement protests formerly arising under *Scanwell* and the APA. *Emery Worldwide Airlines, Inc. v. U.S.*, 264 F.3d 1071, 1079-80; *Novell, Inc. v. U.S.*, 109 F.Supp.2d 22, 24-25 (D.D.C. 2000). It would defeat the purpose of the sunset clause if procurement protest cases could still be brought in district court under the APA. *Novell*, 109 F.Supp.2d at 24-25. Because the Court finds that Fire-Trol alleges the violation of a statute or regulation in connection with a proposed procurement, under the ADRA, the Court of Federal Claims has exclusive jurisdiction. Therefore, the jurisdiction granted the Court under § 1331 and the waiver of sovereign immunity in the APA have been preempted.

**III. Whether the Court has Jurisdiction Over this Action Under the APA if the Forest Service Established a "Rule".**

Fire-Trol contends that the decision by the Forest Service regarding the contents of the fire retardant it will procure amounts to the establishment of a "rule" under the APA. They argue that because the Forest Service established a rule it must comply with the notice

and public procedure requirements of 5 U.S.C. § 553. However, even if the decisions by the Forest Service do amount to the establishment of a "rule", and the Forest Service violated § 553, jurisdiction does not exist in the District Court.[5] Under § 702 of the APA, a person suffering legal wrong or adversely affected by agency action is entitled to review thereof. 5 U.S.C. § 702. However, § 704 of the APA, entitled "Actions Reviewable", establishes that only "Agency actions made reviewable by statute and *final agency action for which there is no other adequate remedy in a court* are subject to judicial review" under the APA. 5 U.S.C. § 704 (emphasis added). The general grant of review in the APA does not provide additional judicial remedies in situations in which Congress has already provided special and adequate review procedures. *Bowen v. Massachusetts*, 487 U.S. 879, 902 (1988).

As already noted, the Court of Federal Claims has jurisdiction under the ADRA because Fire-Trol alleges the violation of statutes and regulations (including § 553) in connection with a proposed procurement. The only remedies Fire-Trol seeks in this case are declaratory and injunctive relief, both of which the Court of Federal Claims may grant under § 1491(b)(2) of the ADRA. *See* 5 U.S.C. § 1491(b)(2). Furthermore, § 1491(b)(4) of the ADRA expressly adopts the scope of review for agency actions found under § 706 of the APA.[6] *See* 5 U.S.C. § 1491(b)(4). Because Congress has provided an adequate remedy in

---

[5] Both parties seem to assume that the establishment of a rule and the existence of a procurement protest are mutually exclusive. The Court disagrees that both cannot exist simultaneously. For example, an agency may establish a rule, which effects a proposed procurement, thereby creating a procurement protest.

[6] Under § 706(2) of the ADRA, the reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be:
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute;
(F) unwarranted by the facts to the extent that the facts are subject to trial *de novo* by the reviewing court.

the Court of Federal Claims over this action, the general grant of review in § 702 of the APA does not vest the Court with jurisdiction pursuant to 28 U.S.C. §1331.[7]

**IV. Whether the District Courts have Retained Any Jurisdiction Over Procurement Protests Under the CICA.**

Fire-Trol also argues that the Court has jurisdiction over its CICA claims under 28 U.S.C. § 1331 because jurisdiction has not been committed to any other forum. Prior to 1996, CICA provided that an "interested party" could file a protest concerning an "alleged violation of a procurement statute or regulation" with the Comptroller General, in District Court, or in the Court of Federal Claims. 31 U.S.C. §§ 3552, 3556; *See Waste Management of North America, Inc. v. Weinberger*, 862 F.2d 1393, 1396 (9th Cir. 1988). However, in 1996, Congress inserted a sunset clause into § 3556 which is directly dependent upon the sunset clause found in §1491 of the ADRA. *See* Pub.L. 104-320 § 12(f), 110 Stat. 3876. The sunset clause provides:

> "In the event that the bid protest jurisdiction of the district courts of the United States is terminated pursuant to subsection (d) [section 12(d) of Pub.L. 104-320 set out as a note under section 1491 of Title 28, Judiciary and Judicial Procedure], then section 3556 of title 31, United States Code [this section], shall be amended by striking 'a court of the United States or' in the first sentence.".

*Id.* Therefore, when the jurisdiction of the district courts expired under the ADRA on January 1, 2001, it also expired under the CICA. Like the APA sunset clause, it would defeat the very purpose of this clause if procurement protest cases could still be brought in district court under the CICA.

Because the Court finds that Fire-Trol has alleged the violation of a statute or regulation in connection with a proposed procurement, this case is a procurement protest.

---

5 U.S.C. § 706(2)(A)-(F).

[7] The Tenth Circuit Court of Appeals recently held that the ADRA only waives sovereign immunity for a suit in the Court of Federal Claims when the suit is brought by an actual or prospective bidder. *City of Albuquerque v. U.S. Dept. of the Interior*, 2004 WL 1664211 (10th Cir.). Because Fire-Trol is a potential bidder in this case, *City of Albuquerque* is inapposite.

Therefore, under the ADRA, jurisdiction lies in the Court of Federal Claims. Furthermore, Congress's failure to renew district court jurisdiction prior to January 1, 2001 is evidence of its intent that any case falling into the category of a procurement protest would be subject to the specific jurisdictional language of the ADRA. Accordingly, the Court cannot exercise jurisdiction over Fire-Trol's claims and the Motion to Dismiss for Lack of Subject Matter Jurisdiction is granted.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant U.S. Department of Agriculture Forest Service's Motion to Dismiss for Lack of Subject Matter Jurisdiction (Doc. #215) is granted.

**IT IS FURTHER ORDERED** that Plaintiff's request for a transfer of the case to the Court of Federal Claims pursuant to 28 U.S.C. 1631 is denied.

DATED this 12 day of ~~July,~~ AUG 2004.

James A. Teilborg
United States District Judge