# EXHIBIT "N"

United States Department of Agriculture | Forest Service | Washington Office | 13th & Independence SW
P.O. Box 96090
Washington, DC 20090

File Code: 5160/6320

Date: OCT 4 2002

FIRE-TROL Holdings, LLC
Attn: Joe Grigel, General Manager
2620 North 37th Drive
Phoenix, AZ 85009

Dear Mr. Grigel:

The June 1, 2000, letter sent to the retardant companies set the stage for the 2004 retardant contracts. There were four key items in that letter which are listed below along with the current disposition for each item.

1. **The federal agencies will no longer accept retardants containing sodium ferrocyanide (YPS) for the year 2004 retardant contracts.**

   We are firm in directing YPS to be removed from retardant. However, please see attached pages referring to the 2004 and beyond retardant contract. Language in the 2004 contract will address this issue and there will be no further extensions on this position. We will allow an additional year to our original position.

2. **The USDA Forest Service will only accept bids for a gum-thickened product in the year 2004 contracts.**

   This position was modified to be in line with the decision on YPS above. We will only accept product for bid in 2005 which contains at least 100 cps, which is the amount our research indicates improves drop characteristics.

3. **The year 2001 contracts will be done on a basis of sealed bid. There will be no allowances for company viability.**

   As this was settled previously, this is a moot point.

4. **We will not revisit the decision which was made in April 1999 on the fugitive issue. The specification for the contract will be 5100-304b approved in January 2000.**

   This position has been modified in that, if anyone can come up with a definition for fugitive product which is measurable and yields the desired results, then we will certainly re-evaluate adding a definition for fugitive product back into the specification. In the meantime, federal airtanker bases will not use a "fugitive product."

We have developed the attached proposed strategy for the 2004 contract cycle and beyond. Implementation of this strategy will result in an annual contract for a third of the bases. We believe that these changes will lend stability to the marketplace and will achieve our desired result for a retardant product containing no YPS. This process also allows us flexibility in award in the event that there are other companies who have completed laboratory evaluation and who would like to complete a field test to gain a fully approved product.

We anticipate that this proposed strategy is set for the 2004 contract; however, we would like to receive your comments especially on the breakdown of the bases. This is about the sixth version we have developed trying to balance both volume (equal to 6 MM gallons per year) and the annual usage history to insure that there is an appropriate mix of bases. If you have suggestions on which bases are bid in any given year, please forward these to Paul Solarz and Frank Gomez. We anticipate development for the 2004 contracts to begin in January 2003 to allow adequate time for reviews prior to solicitation.

If there are questions regarding the attached information, please contact either Alice Forbes (208) 387-5605 or Paul Solarz (406) 329-4719.

Sincerely,

JERRY T. WILLIAMS
Director
Fire and Aviation Management

Robbie E. Chrishon
ROBBIE CHRISHON
Director
Acquisition Management

Enclosure

cc:
Paul Solarz, MTDC
Alice Forbes, NIFC
Frank Gomez, NIFC

# 2004 Contract Proposal for Bulk and Full Service Retardant Contracts

This proposal will allow for the continuity of both suppliers and for the companies to maintain some level of viability by not risking their whole operation in any given year.

Consideration was given to the following in the development of this proposal:

1. The ten-year average usage is approximately 18 million gallons annually.

2. The annual amount to be bid would be approximately 6 million gallons of product.

3. Full service bases represent about 10 million gallons of the total of 18 sold annually which represents approximately 3.3 million gallons for the thirds option.

4. Bulk bases are roughly about eight million of the 18, or 2.7 million gallons.

5. The annual contracted amount will come from a mix of full service and bulk bases.

6. All bases will be bid in 2004:
   - one-third of these bases being a one-year contract for 2004 only. This third of the bases will be re-bid in 2005;
   - one-third for 2004 plus one option year to be re-bid in 2006; and
   - one-third for 2004 plus two option years to be re-bid in 2007.

7. For the 2004 bid ONLY, products containing YPS can be bid at all bases.

8. YPS-containing products will not be bid in 2005 and beyond.

CHART 1: Graphic demonstration of how the contract will be structured into the future.

| Bases | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
| 1/3* | One year | RE-BID ** One year plus two options | | | RE-BID |
| 1/3 | One year Plus one option | | RE-BID ** One year plus two options | | RE-BID 2009 |
| 1/3 | One year plus two options | | | RE-BID ** One year plus two options | RE-BID 2010 |

* Appropriate combination of full service / bulk bases. (See attached.)
** No product containing sodium ferrocyanide can be bid on this third of the basis (bid item).

# Three-Year Cycle - Proposed

## 2004 Only: (Re-bid 2005)

**Bulk Bases(2.7 million gallons)**

| | |
|---|---|
| F | Grangeville |
| A | Silver City A |
| F | Hollister |
| A | Rhonerville |
| A | John Day |
| F | Klamath Falls |
| F | Redmond |
| F | Ft. Wainwright |
| F | Coeur d'Alene |
| A | West Yellowstone A |
| A | Asheville |
| A | Ft. Smith |
| F | Ft. Yukon |
| F | Galena |

**Full Service Bases (3.3 million gallons)**

| | |
|---|---|
| F | Billings |
| F | Grand Junction |
| F | Albuquerque |
| F | Chester |
| F | Fresno |
| F | Redding |
| H (A) | Santa Barbara |

**Current Contractor:**

F – FIRE-TROL, LLC
A – Astaris, LLC
H – Hunot

## 2004 plus one option year (Re-Bid 2006):

**Bulk Bases(2.7 million gallons)**

F Missoula
F McCall
A Columbia
A Paso Robles
A Santa Rosa
A Medford
A Knoxville
A Rapid City A
A Montague
F Durango
F White River

**Full Service Bases (3.3 million gallons)**

F Helena
F Ft. Huachuca
F Boise
F Pocatello
F Minden
H (A) Ramona
F San Bernardino
F Hill

**Current Contractor:**

F – FIRE-TROL, LLC
A – Astaris, LLC
H – Hunot

EXHIBIT "O"

CIFFC
CANADIAN INTERAGENCY FOREST FIRE CENTRE
CENTRE INTERSERVICES DES FEUX DE FORÊT DU CANADA
210 - 301 WESTON STREET, WINNIPEG, MANITOBA R3E 3H4

July 8, 2003

Mr. R.W. (Ron) Bradley
Vice President and General Manager
Fire-Trol Canada Company
455 Dene Drive
Kamloops, BC
V2H 1J1

Dear Ron,

Thank you for your letter of June 30, 2003 and your questions surrounding the Qualified Products List. They were indeed thought provoking and have formed the basis for more discussion in the future. I would like to address each question in turn.

1) We at CIFFC were unaware of new test protocols for class A foams but in discussion with MTDC staff in Missoula were able to confirm your suspicions. It is our understanding that additional non-metallic compounds have been added to the Canadair portion of the testing. Apparently all products will be re- tested and a broad spectrum of non-metallics will be used in the future specification. Every opportunity will be provided to ensure that existing products are not eliminated from the QPL. As this is an international specification the USFS will be using the same protocols, in fact that's who will be developing them.

2) Phos-Chek LV-R field tested at Lac LaBiche and Hudson Bay was not, as I had surmised, subjected to 90 day corrosion tests after over winter storage. A review of the test plan identified that this was not a requirement. As you are no doubt aware the complexity of the field evaluation is determined on a case by case basis and can focus on any problem areas identified during the laboratory evaluation. I am unable to provide you with a copy of the test plan for this project.

3) Discussions with MTDC staff in Missoula reveal that Phos-Chek LC-95A at 5.5:1 and Phos-Chek LC-95D at 4.25:1 had been field tested successfully in the US (under a different name) in 1993-94. The Canadian Performance Requirements for Long Term Retardants are tied to the USFS QPL by the statement "Products that satisfy the requirements of the USDA 5100 304b specification and are fully qualified for use by the U.S. Forest Service are considered to meet the Canadian User Agencies requirements." A product that makes it on to the USFS page of the QPL as fully qualified will also show on the CIFFC page as fully qualified. Notwithstanding this however, the Canadian Performance Requirements Document also states "At the option of the Canadian User Agency and after meeting the performance requirements outlined in this document, the Canadian User Agency may acquire the product for operational evaluation."



Telephone (204) 784-2030 v.ciffc.ca Telecopier (204) 956-2398

The June 2003 QPL shows Phos-Chek HV-R at 3.6:1, Phos-Chek MV-R at 3.6:1 and Phos-Chek LV-R at 3.6:1 as fully approved products. Even though Phos-Check LV-R was the only product that completed the operational test, the differences in this family of retardants are not significant enough to require separate operational tests of each formulation.

MTDC assures us that the Lot Assurance Quality Acceptance process in place in the US has been formally and officially adopted and any discussion regarding the legality of that process will have to be deferred to them.

We do not believe that the approval process has changed in essence, although concede that the adoption of the LAQA process in the United States has created further differences between the US and Canadian specifications.

We will be reviewing the Qualifying Performance Requirements for Long Term Retardants later this fall to ensure that Canadian User Agencies are getting fire retardant products that are effective, efficient and safe. To that end we invite comments from the industry on how the specification can be improved upon.

If you would like to discuss any of these issues further please do not hesitate to contact me.

Best regards,

Dave Bokovay
Aviation/Technology Manager
Canadian Interagency Forest Fire Centre
210-301 Weston Street
Winnipeg, Manitoba
R3E 3H4

aircraft@ciffc.ca

EXHIBIT "P"

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FIRE-TROL HOLDINGS, LLC, | ) | |
| Plaintiff, | ) | No. 04-240C |
| v. | ) | (Senior Judge Wiese) |
| THE UNITED STATES, | ) | **FILED UNDER SEAL PROTECTED MATERIAL TO BE DICLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER** |
| Defendant, | ) | |
| and | ) | |
| HUNOT RETARDANT CO., And ASTARIS LLC, | ) | |
| Intervenors. | ) | |

## SECOND DECLARATION OF CECILIA W. JOHNSON

I, Cecilia W. Johnson, declare as follows:

1. I have worked for the Wildland Fire Chemical Systems program (WFCS, and its predecessor units) of the United States Department of Agriculture Forest Service ("Forest Service") since 1970.

2. The burn chamber and wind tunnel are located at and under the control of the Fire Lab, a unit of the Forest Service Rocky Mountain Experiment Station. Each year, normally in late summer, a coordination meeting is held to schedule the use of the burn facilities for the upcoming year. The three fire research programs located at the Fire Lab also use the burn facility for their work. Some of these projects are based on joint research projects with other agencies and have taken several years to schedule and set up. Other projects need to use the facility in conjunction with field work so it is more time sensitive. WFCS has scheduled use of the facility for April and May of this year. Dr. Jack Cohen is scheduled to use the facility from June through August. We will not know about additional plans until the next scheduling meeting is held. The impact of losing access to the facility for any project or researcher can be very significant although it may not be measurable in dollars.

3. The Forest Service has specific requirements for the burn test conditions (90 degree F, 20% Relative Humidity, and 5 mph wind). These conditions can be obtained and maintained most reliably when the weather conditions outside are favorable, i.e. outside temperature and humidity are moderate. Not only does extremely cold weather make it impossible to maintain the correct heat and relative humidity conditions, but the heating system for the burn tests also heats the office building and cannot supply both in cold weather. Extreme summer conditions make adequate control impossible because the system cannot compensate for the high

temperatures and very low humidity. Even during the spring and fall, rapid changes in the outside weather conditions (i.e., frontal passages) can force us to stop testing for portions of a day to allow conditions to stabilize. For these reasons, the latest we expect to be able to continue into the fall season is mid-November and the earliest we expect to proceed is late February, if spring is early.

4. We are conducting burn tests right now. As a general guide, we plan on taking one week for each product test that we perform. We have scheduled testing for one product from a new supplier. If everything went exactly as planned, the testing would be completed this week; however, based on the results that we have so far, we now anticipate another week to complete testing on an adjusted concentration of this product.

5. The remainder of the April-May 2004 burn test availability is scheduled to perform testing for Astaris. They have submitted [redacted] There is an interagency agreement between the USDA Forest Service and the Canadian Interagency Forest Fire Centre (CIFFC) to coordinate testing and qualification for the Provincial Forestry Agencies. Because there is some development work involved in the testing of these products, it is unlikely that we will be able test all of the formulations currently scheduled.

6. There are significant time and dollar loses when a test for an individual product is interrupted. The cost to the supplier to test a single product is at least $5600; it can be more if there are inconsistent results and additional replicates are needed.

7. More important than the money is the fact that the evaluation of a product will be set back six months to a year because we can't do most of the other tests until the proper mix ratio is determined by the burn test.

8. We anticipate implementing the revised specification in 2007 or 2008. To accomplish this, products must be qualified and available for bid during a solicitation normally advertised in October or November of the prior year. Because it takes 18 to 24 months to complete all of the testing required to have a new product qualified, these candidate products must be submitted between October 2005 and April 2006 to ensure ability to have a responsive bid. If the products are unique or sufficiently different from existing products, a field test may also be required, taking another year before full qualification is granted.

9. In light of the long time period before a product must be submitted for the 2007 contract, this time frame for testing may seem premature. However, it can require several sets of burn tests to establish the proper mix ratios and salt contents of each type of formulation so that the burn test requirements are met. It is possible that we will not be able to complete this work by the end of May and will need to try to get another opportunity to burn in the fall. (Related issues with fuel availability are discussed below.) Once the mix ratio and salt content for a specific formulation is set, then the fine tuning of thickeners, corrosion inhibitors, colorants, and other minor ingredients must be completed. In most cases, the only way to accomplish this is to do the pertinent tests on many variations. It takes about a little over 3 months to complete a corrosion test and have the results available. A few repetitions of the test, review, reformulate,

retest cycle can rapidly use up the time including any buffer that existed when the project was started.

10. We currently have 7 people from a staff of 9 spending fifty to 100 percent of their time on the burn tests. If a test is interrupted, we must start over again the next time the chamber is available. We would lose the time and effort that was already expended and we must go through the process again and cannot reasonably recoup that money from the product manufacturer.

11. The time and effort required to retest currently qualified products in the burn chamber will use resources that we feel would be better used in preparing for the implementation of the 304C specification.

12. The additional workload of retesting these products will also tie-up a large portion of our workforce so that other required testing (corrosion, pumpability, abrasion, foam product testing, water enhancer product testing) will be delayed. This affects many companies that do not have any long-term retardants.

13. We use two different fuels during burn testing, aspen excelsior to represent the low extractive, woody fuels and Ponderosa pine needles to represent the high extractive, waxy fuels.

14. Excelsior is a commercial product and we can order more as needed. We plan our purchases and testing so that the same batch of excelsior is used for all the testing of a product.

15. We have only enough pine needles to do the "burn testing" scheduled for this spring (April-May). Completing these tests will use virtually all of our stored pine needles.

16. Pine needles are not a commercially available product.

17. It is standard practice that the pine needles used in burn testing are collected in September and October, shortly after they fall from the trees, and preferably from maintained lawns. This procedure minimizes contamination from other vegetative material and noncombustible material. If we stay with this practice, followed for the last 20 years, we would not use any needles collected this fall until they have been stored through the winter to get a consistent drying.

18. We do not have the storage capacity to maintain a large inventory of needles. When needles are stored in deep piles for a long period of time, they break, changing their burning characteristics. Therefore we try to anticipate the need for the next year and collect enough fresh needles to perform the necessary work, with a safety margin, without exceeding proper storage capacity.

19. Not only did we not anticipate a large number of tests but the current storage building is being demolished to make way for a new warehouse at the Fire Lab and many needles are broken when they must be transferred additional times.

20. We do not have sufficient quantities of the specific products involved in the protest to perform the proposed tests. The product samples that we use for all qualification testing, including burn testing, will not be taken from the mixed retardant at a retardant base or from the production line in the companies' production facility. These products are subject to the normal variability of large scale production and the difficulties of obtaining a representative sample by taking a grab sample from the production line. We anticipate that the companies will collect adequate amounts of each raw material from their production stock and then prepare the blends in their laboratory or small scale pilot plant. When I have done plant tours and inspections, I was told that the laboratory personnel are deeply involved in maintaining the quality control of the production samples and that research tends to be given a lower priority during this time. It is likely that the companies will, in my estimation, require several weeks to break from their current production mode and prepare sample mixes in containers that we are able to manage in the lab. This has the potential to interfere with preparations for fire season.

21. Statistics, confidence limits, and margin of error play an important role in the analysis and understanding of burn test results.

22. Many of the products on the current QPL were formulated to minimize the salt contents thus decreasing cost while meeting the minimum effectiveness required by the specification. These products have effectiveness results very close to the edge of the specification requirements. Due to variation in the testing process (fuels, weather, sprayed distribution of product, etc), a retest may show a failure or a passing scores. Similarly, a product that failed by a small margin may pass in a retest.

23. This level of repeatability is typical of test results that are right on the border between passing and failing.

24. This lack of positive passes or failures occurs because there is a moderately large margin of error in performing these tests that attempt to assess natural processes. The standard error of the mean is a measure of the variation between repeats of the same test. A typical burn test has a standard error of the mean for the superiority factor between 0.02 and 0.04, although it may be somewhat higher or lower. This means that there is a statistically defined likelihood that the actual test results will be within the range (confidence interval) represented by the effectiveness minus the standard error and the effectiveness plus the standard error. These methods of estimating the margin of error in the final result were used in most of the burn tests that we have performed. The larger the margin of error, the more likely that different results will be obtained if the test is repeated several times.

25. The significance of the standard error and confidence level is that one series of burn tests may result in the failure of a product not because the product is ineffective, but because that particular series of tests fell within the standard of error. Thus, we would have to repeat burn testing in order to accurately ascertain whether a product will pass the burn test. One series of burn tests per product may not answer this question.

26. Because the burn testing is costly and labor intense, with a limited window of availability for the burn chamber we try to limit the number of product retests; however, if a company wishes to pay for additional tests and if access to the facility is available as well as fuels, we have done additional testing. When products are very close to the passing level we

could end up in a situation of companies wanting multiple retests in hopes of a obtaining a favorable outcome.

Executed on this 15th day of April, 2004.

Cecilia W. Johnson

Cecilia W. Johnson
Project Leader
Wildland Fire Chemical Systems (WFCS)
Missoula Technology and Development Center
United States Forest Service
United States Department of Agriculture

# EXHIBIT "Q"

# NATIONAL LONG TERM FIRE RETARDANT-BULK SUMMARY AWARD INFORMATION
RFP 49-03-09, RFP 49-03-13, RFP 49-03-14

| | | FIRE-TROL | | | | | | | | ASTARIS | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ITEM | BASE | EST. QUANITY | PROD | LOT NUMBER | PACKAGE OFFERED | PRICE PER TON | TRANSPORTATION | YIELD | TOTAL BID PRICE PER GALLON | EST. QUANITY | PROD | LOT NUMBER | PACKAGE OFFERED | PRICE PER TON | TRANSPORTATION | YIELD |
| | ONE YEAR - NO OPTIONS - RFP 49-03-09 | | | | | | | | | ONE YEAR - NO OPTIONS - RFP 49-03-09 | | | | | | |
| 1 | COEUR D ALENE, ID | | LCG-R | 91-FT-55 | BULK | $479.96 | 31.58 | 923 | $0.554 | 177,386 | LV-R | 4427744-B | BULK | $409.60 | 63.5 | 860 |
| 2 | GRANGEVILLE, ID | 114,749 | GTS-R | 60-04 | BULK BAG | $662.50 | 46.2 | 1325 | $0.535 | | D75-R | 3616870-H | BULK BAG | $997.51 | 74.09 | 1786 |
| 3 | WEST YELLOWSTONE, MT | 253,896 | GTS-R | 60-64 | BULK BAG | $662.50 | 58.8 | 1325 | $0.544 | | D75-R | 3616870-H | BULK BAG | $947.69 | 52.45 | 1786 |
| 4 | SILVER CITY, NM | | LCA-R | 91-FT-54 | BULK | $605.56 | 53.27 | 972 | $0.678 | 552,092 | D75-R | 3616870-H | PHOS BIN | $968.57 | 49.45 | 1786 |
| 5 | JOHN DAY, OR | 42,422 | LCG-R | 91-FT-55 | BULK | $479.96 | 44.71 | 923 | $0.568 | | LV-R | 4427744-B | BULK | $471.59 | 65.91 | 860 |
| 6 | KLAMATH FALLS, OR | 376,669 | LCA-R | 91-FT-54 | BULK | $466.56 | 36.44 | 972 | $0.517 | | LV-R | 4427744-B | BULK | $437.93 | 52.27 | 860 |
| 7 | REDMOND, OR | 664,962 | LCA-R | 91-FT-54 | BULK | $466.56 | 49.05 | 972 | $0.530 | | LC95-A | 1051695-A | BULK | $529.53 | 71.25 | 1054 |
| 8 | ASHEVILLE, NC | | LCA-R | 91-FT-54 | BULK | $687.72 | 294.05 | 972 | $1.010 | 65,279 | D75-R | 3616870-H | PHOS BIN | $1,139.43 | 110.77 | 1786 |
| 9 | FT. SMITH, AR | | LCA-R | 91-FT-54 | BULK | $687.72 | 178.42 | 972 | $0.891 | 111,740 | D75-R | 3616870-H | PHOS BIN | $1,106.44 | 72.32 | 1786 |
| 10 | FT. WAINWRIGHT, AK | 110,706 | LCG-R | 91-FT-55 | BULK | $479.96 | 236 | 923 | $0.776 | | LC95-A | 1051695-A | BULK | $556.41 | 497.59 | 1054 |
| 11 | GALENA, AK | 7,821 | LCG-R | 91-FT-55 | BULK | $479.96 | 427.4 | 923 | $0.983 | | LC95-A | 1051695-A | BULK | $730.53 | 534.27 | 1054 |
| | ESTIMATED AWARD | 1,571,225 | | | | | | | | 906,497 | | | | | | |
| | ONE YEAR WITH ONE OPTION YEAR - RFP 49-03-13 | | | | | | | | | ONE YEAR - WITH ONE OPTION YEAR - RFP 49-03-13 | | | | | | |
| 1 | MISSOULA, MT | 456,321 | GTS-R | 60-64 | BULK BAG | $636.00 | 50.75 | 1325 | $0.516 | | D75-R | 3616870-H | BULK BAG | $685.26 | 61.32 | 1786 |
| 2 | RAPID CITY, SD | | LCG-R | 91-FT-55 | BULK | $479.96 | 136.3 | 923 | $0.668 | 240,638 | LV-R | 4427744-B | BULK | $481.35 | 86.25 | 860 |
| 3 | DURANGO, CO | 319,628 | LCA-R | 91-FT-54 | BULK | $476.28 | 69.93 | 972 | $0.562 | | LV-R | 4427744-B | BULK | $499.00 | 60 | 860 |
| 4 | WHITE RIVER, AZ | 75,526 | LCA-R | 91-FT-54 | BULK | $486.00 | 33.79 | 972 | $0.535 | | LV-R | 4427744-B | BULK | $546.00 | 47.4 | 860 |
| 5 | MCCALL, ID | 385,796 | LCG-R | 91-FT-55 | BULK | $452.27 | 52.01 | 923 | $0.546 | | LV-R | 4427744-B | BULK | $465.70 | 24.5 | 860 |
| 6 | PORTERVILLE, CA | 471,438 | GTS-R | 60-64 | BULK BAG | $636.79 | 30.21 | 1325 | $0.503 | | D75-R | 3616870-H | BULK BAG | $997.25 | 38.63 | 1786 |
| 7 | MONTAGUE, CA | 157,302 | LCA-R | 91-FT-54 | BULK | $486.00 | 24.67 | 972 | $0.525 | | D75-R | 3616870-H | PHOS BIN | $1,026.15 | 45.45 | 1786 |
| 8 | LAGRANDE, OR | 619,404 | LCG-R | 91-FT-55 | BULK | $461.50 | 28.19 | 923 | $0.531 | | LV-R | 4427744-B | BULK | $419.75 | 53.25 | 860 |
| 9 | KNOXVILLE, TN | | LCA-R | 91-FT-54 | BULK | $687.72 | 277.12 | 972 | $0.993 | 190,354 | D75-R | 3616870-H | PHOS BIN | $1,127.93 | 122.27 | 1786 |
| | ESTIMATED AWARD | 2,485,415 | | | | | | | | 430,992 | | | | | | |
| | | FIRE-TROL | | | | | | | | ASTARIS | | | | | | |

NATIONAL LONG TERM FIRE RETARDANT-BULK SUMMARY AWARD INFORMATION
RFP 49-03-09, RFP 49-03-13, RFP 49-03-14

**FIRE-TROL**

ONE YEAR - WITH TWO OPTION YEARS - RFP 49-03-14

| ITEM | BASE | EST. QUANITY | PROD | LOT NUMBER | PACKAGE OFFERED | PRICE PER TON | TRANSPORTATION | YIELD | TOTAL BID PRICE PER GALLON |
|---|---|---|---|---|---|---|---|---|---|
| ITEM | BASE | EST. QUANITY | PROD | LOT NUMBER | PACKAGE OFFERED | PRICE PER TON | TRANSPORTATION | YIELD | TOTAL BID PRICE |
| 1 | KALISPELL, MT | 285,758 | GTS-R | 60-64 | BULK BAG | $662.50 | 55.83 | 1325 | $0.542 |
| 2 | JEFFCO, CO (DENVER) | 234,676 | LCA-R | 91-FT-54 | BULK | $486.00 | 125.61 | 972 | $0.629 |
| 3 | ALAMORGORDO, NM | | GTS-R | 60-64 | BULK BAG | $695.62 | 79.96 | 1325 | $0.585 |
| 4 | ROSWELL, NM | 75,814 | LCA-R | 91-FT-54 | BULK | $486.00 | 86.86 | 972 | $0.589 |
| 5 | BISHOP, CA | | LCA-R | 91-FT-54 | BULK | $631.60 | 53.4 | 972 | $0.705 |
| 6 | OMAK, WA | 54,969 | LCG-R | 91-FT-55 | BULK | $479.96 | 37.72 | 923 | $0.561 |
| 7 | TROUTDALE, OR | 55,381 | LCG-R | 91-FT-55 | BULK | $479.96 | 38.51 | 923 | $0.562 |
| | ESTIMATED AWARD | 706,598 | | | | | | | |

**ASTARIS**

ONE YEAR - WITH TWO OPTION YEARS - RFP 49-03-14

| ITEM | BASE | EST. QUANITY | PROD | LOT NUMBER | PACKAGE OFFERED | PRICE PER TON | TRANSPORTATION | YIELD | TOTAL PRICE PER GALLON |
|---|---|---|---|---|---|---|---|---|---|
| ITEM | BASE | EST. QUANITY | PROD | LOT NUMBER | PACKAGE OFFERED | PRICE PER TON | TRANSPORTATION | YIELD | TOTAL PRICE |
| 1 | KALISPELL, MT | | D75-R | 3616870-H | BULK BAG | $932.52 | 67.64 | 1786 | [illegible] |
| 2 | JEFFCO, CO (DENVER) | | LV-R | 4427744-B | BULK | $488.90 | 61.5 | 860 | [illegible] |
| 3 | ALAMORGORDO, NM | 362,355 | D75-R | 3616870-H | PHOS BIN | $960.88 | 75 | 1786 | $0.58 |
| 4 | ROSWELL, NM | | LV-R | 4427744-B | BULK | $562.25 | 65.55 | 860 | [illegible] |
| 5 | BISHOP, CA | 58,510 | D75-R | 3616870-H | PHOS BIN | $1,061.57 | 36.82 | 1786 | [illegible] |
| 6 | OMAK, WA | | LC95-A | 1051695-A | BULK | $618.49 | 98.23 | 1054 | [illegible] |
| 7 | TROUTDALE, OR | | LC95-A | 1051695-A | BULK | $632.30 | 84.42 | 1054 | $0.68[illegible] |
| | ESTIMATED AWARD | 420,665 | | | | | | | |