# EXHIBIT "T"

RECEIVED
JUN 28 2004
CLERK, U.S. DISTRICT COURT
DISTRICT OF MONTANA
MISSOULA

FILED
BILLINGS, MT
2004 JUN 25 PM 4 13
PATRICK E. DUFFY, CLERK
BY
DEPUTY CLERK

WILLIAM MERCER
United States Attorney
MARK STEGER SMITH
Assistant United States Attorney
P.O. Box 1478
Billings, Montana 59103
Telephone No: (406) 247-4667
Facsimile No: (406) 657-6989
THOMAS L. SANSONETTI
Assistant Attorney General
Environment and Natural Resources Division
CYNTHIA S. HUBER
Senior Attorney
BENJAMIN LONGSTRETH
Trial Attorney
General Litigation Section
JAY GOVINDAN
Trial Attorney
Wildlife and Marine Resources Section
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 663
Washington, D.C. 20044-0663
Telephone: (202) 514-5273/(202) 514-4353/ (202) 305-0237
Facsimile: (202) 305-0506
Cynthia.Huber@usdoj.gov
Attorneys for Defendants

UNITED STATES DISTRICT COURT
DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| FOREST SERVICE EMPLOYEES FOR ENVIRONMENTAL ETHICS,<br>Plaintiff,<br><br>v.<br><br>UNITED STATES FOREST SERVICE, an agency of the United States Department of Agriculture,<br>Defendant. | Civ. No. 03-165-M-DWM<br><br>DECLARATION OF ALICE FORBES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT |

RECEIVED
JUL 28 2004
BY:

8

I, Alice Forbes, declare as follows:

I have been employed by the Forest Service for over 29 years. I am currently the Assistant Director, Operations for the Fire and Aviation Management Staff in the headquarters of the Forest Service. My duty station is the National Interagency Fire Center (NIFC) in Boise, Idaho. In addition to working at NIFC, I spend considerable time working in the Forest Service Washington Office (Headquarters) located in Washington, D.C. I have been employed in my current position, first in an Acting capacity from April 2002 until I was permanently appointed in July 2002. I am responsible for the cost-effective coordination of national resources in support of wildland fire operations and other emergencies on National Forest System lands, and the lands of cooperating Federal and State agencies and foreign countries.

Prior to my appointment as Assistant Director, I was the Deputy Assistant Director from May 2001 to March 2002. Prior to this, I was the Branch Chief, Equipment and Chemicals Branch for the Forest Service. My duty station was NIFC, Boise, Idaho. I was in that position from 1996 to 2001. In that position, I worked extensively in planning and operations of fire chemicals, including long term fire retardant. I worked closely with the Missoula Technology Development Center in Missoula, Montana, and the contracting staff at NIFC with respect to retardant testing and contracting respectively.

Throughout my career in the Forest Service, I have gained extensive experience in various aspects of fire planning, fire operations, and all aspects of fire policy. I have first hand knowledge of the facts herein, except where I specifically note otherwise.

I received a BS in Forest Resource Management from Humboldt State University. I have attended various continuing education and training courses through the USDA Forest Service over the past 29 years.

The following facts are based on my personal knowledge, experience and review of Forest Service records.

1. The term wildland fire refers to any fire whether caused by natural ignition (e.g., lightning strike) or human caused (e.g., arson, dropped cigarette, unattended campfire).

2. On June 23, 2004, in the United States, 123 wildland fires, encompassing more than 39,769 acres, were burning in federally owned, tribal, state and private lands. There have been 36,021 fires that have burned 821,699 acres since January 1, 2004. (http://www.nifc.gov/news/nicc.html)

3. Fire season is year round in the United States. The Western Fire season starts in May and is generally over by November. The actual beginning and end of the fire season each year is determined by various factors such as amount and duration of snowpack, precipitation, dryness of fuels, and ignitions (lighting or human caused). While the Forest Service can generally predict the approximate dates when the annual fire season will begin, it cannot predict where

fires will burn or how many fires there will be.

4. I have examined the statistics compiled by the National Interagency Fire Center and in the 2003 fire season there were more than 63,629 wildfires that burned in the United States. A total of 3,960,842 acres burned of federal, tribal, state and private lands.

5. I have also examined the statistics compiled by the National Interagency Fire Center that show that in the 2002 fire season there were 73,457 wildfires that burned a total of 7,184,712 acres.

6. Fires endanger lives, public health, property, and natural resources. In Southern CA, over 750,043 acres burned, 3,710 homes were lost and 24 people were killed, including one firefighter, for the period from October 21 through November 4, 2003. The estimated cost of suppressing these fires was $123.2 million.

7. Wildland Fire is a fact of life in the national forests and elsewhere in the western United States. The natural occurrence of fire varies widely across the country in both time and space. Fire is a natural agent of vegetative dynamics in the national forest.

8. Following severe fire seasons between 1909 and 1934, the Forest Service introduced a fire policy to aggressively suppress all fires and to prevent human caused fires.

9. By 1978, national fire management policy recognized the potential for fire to be used as a management tool to achieve resource objectives and ensure forest health.

10. In the 1990's, given growing concern with conditions in the national forests and other public lands, the Forest Service ("FS")/United States Department of Agriculture ("USDA") and the Department of the Interior ("DOI") began to issue various guidelines and policies concerning fire management activities. These guidelines and policies are similar to the type of policies that the FS has for other day-to-day operations.

11. The FS/USDA and DOI collectively manage large amounts of federal lands. Fires often affect lands under the jurisdiction of both the Forest Service and DOI. Fire management in this context includes fuels management activities, responding to wildland fires as they occur and immediate post-fire responses.

12. Some of the national fire management guidelines and policies are:

a) 1995 Federal Wildland Fire Management Policy and Program Review Final Report (USDA/DOI). This was designed to ensure that federal policies were uniform and programs in the two agencies were cooperative and cohesive. The agencies were directed to implement the principles, policies and recommendations in the Final Report. It required fire management plans for all areas subject to wildland fires. The plans were to develop fire management goals and

objectives, address all potential wildland fire occurrences and include a full range of fire management actions, be linked to the LRMPs, and incorporate wildland/urban interface considerations. Available online at: http://www.nifc.gov/fire_policy/index.htm

b) Wildland and Prescribed Fire Management Policy - Implementation Procedures Reference Guide (1998) (USDA/DOI). This provides direction, guidance and assistance in interpreting the 1995 Policy by providing standardized procedures to guide implementation of the Policy. It provides direction to the field as to specific procedures and formats for addressing different fire management activities including how to respond to wildland fire. (http://fsweb.f11.r6.fs.fed.us/fire/fsweb/fm_policy/reference_guide/refguide.rtf)

c) Cohesive Strategy - Protecting People and Sustaining Resources in Fire-Adapted Ecosystems (2000)(USDA). This was prepared to respond to Congressional direction to provide a strategic plan to reduce wildland fire risk and restore forest ecosystem health in the interior West. It includes institutional objectives and milestones, establishes program management priorities and identifies performance measures. Available at: http://www.fireplan.gov/10yrIPfinal.pdf

d) National Fire Plan - Managing the Impact of Wildfires on Communities and the Environment: A Report to the President in Response to the Wildfires of 2000 (2000)(USDA/DOI). This was prepared to respond to a Presidential request to recommend how best to respond to the severe fires in 2000, reduce the impacts of those fires, and ensure sufficient firefighting resources in the future. It provides an overall framework for implementing fire management and forest health programs and promotes an interagency approach. It also set out the strategic framework for reducing hazardous fuels buildup within priority areas. Available at: http://www.fireplan.gov/president.cfm

e) 2001 Review and Update of the 1995 Federal Wildland Fire Management Policy and Program Review (USDA/DOI). This document provides philosophical and strategic direction for federal fire management programs. It reiterates and adds to federal fire policy. It recognizes that fire management plans identify and integrate all fire management and related activities within the context of approved LRMPs. Available at http://www.nifc.gov/fire_policy/index.htm

f) Forest Service Manual 5100. This manual provides overall guidance in fire management for the Forest Service. Chapter 60, section 51632 provides that the objective is to have available and utilize adequate types and quantities of qualified fire chemical products to accomplish fire management activities safely, efficiently, and effectively. Available at: http:www.fs.fed.us/im/directives/fsm/5100/5100_zero_code.txt

g) Guidelines for Aerial Delivery of Retardants or Foam near Waterways (Guidelines). This document sets forth the operational standard that retardant is not to be dropped within 300 feet of waterways. It gives guidance to pilots in accomplishing this objective, and allows an exception in the case of an emergency. A copy of the Guidelines is attached hereto as Exhibit 1.

h) Healthy Forest Initiative--This initiative calls for administrative improvements that ensure more timely decisions, greater efficiency, and better results in projects that reduce the risk of catastrophic wildfires and restore forest and rangeland health. Available at: http://www.healthyforests.gov/initiative/introduction.html See also http://www.whitehouse.gov. http://www.healthyforests.gov/initiative/introduction.html

i) Fireline Handbook. This is a document that on-the-ground firefighters use to guide the suppression operations. It contains a variety of material on suppression tactics and objectives, as well as a section on retardant use and effectiveness.

(http://www.nwcg.gov/pms/large.html#FirelineHandbook)

j) Incident Response Pocket Guide: This reference is a size to fit in a shirt pocket. It is yet another tool containing guidelines and policies for fire suppression. Page 57 through 59 addresses the Principles of Retardant Application.

(http://www.nwcg.gov/pms/pubs/IRPG_Jan2004.pdf)

k) Interagency Standards for Fire and Fire Aviation Operations 2004, Chapter 12. This guide provides overall direction and guidance for retardant application, use and safety for our ground firefighting personnel. (http:www.fire.blm.gov/standards/redbook.htm)

13. A primary goal of these national fire management policies and guidelines is to take reasonable steps to minimize the risks that catastrophic fires will occur while at the same time facilitating the ability of the national forests to return to historical conditions, as appropriate. The policies and guidelines also provide guidance on how to respond to fires once they occur.

14. Fire Management Plans tier from each Forest's Land and Resource Management Plan ("LRMP"). As to each management area within the national forest, the LRMP provides guidance whether to suppress or not suppress fires and in some cases, modifies the range of suppression action that may be used.

15. Fire can be used as a management tool in two ways. First, the Forest Service can use prescribed burns, which are planned fires set and monitored by the Agency. Second, under certain conditions the Forest Service can use wildland fires that have been naturally ignited. In

this case, the wildland fire is managed to control the nature of the burn and keep it within a defined area. The Forest Service uses prescribed burns and managed wildland fires to reduce the accumulation of vegetation that if left alone can increase the severity of later fires. Prescribed burns and managed wildland fires also are used to manipulate fuel loading in a particular area, and to maintain the diversity of the trees since certain trees need fire to regenerate.

16. Fuels management is one of two main categories of site specific fire management tools. The other is wildland fire response

17. Responses to wildland fires can be through one or a combination of the following: monitoring the fire, attempting to suppress the fire, or managing the fire for resource objectives and/or to reduce fuel loadings. How the forest will respond to a particular fire is dictated by the conditions (e.g., temperature, humidity, wind speed and direction, terrain, location, whether drought conditions are present, etc.).

18. Every Forest has a FMP that indicates what suppression strategies may be appropriate to consider when there is an ignition within the Fire Management Area. These strategies can include anything from Wildland Fire Use ("WFU") to the use of minimum suppression tactics to a full out suppression action. If WFU is an option, an analysis of the prevailing condition is made and if they are appropriate (weather, etc), the local line officer makes the decision to implement Wildland Fire Use. If the decision is not to fight the fire but to use it for resource management, the local unit or a Fire Use Management Team will prepare a Wildland Fire

Implementation Plan ("WFIP"). When the Forest Service decides to suppress a fire, as is most often the case, and the initial suppression effort is not successful, the Forest Service develops a Wildland Fire Situation Analysis ("WFSA").

19. Use of Wildland fire ("WFU") is not an appropriate resource management tool in all circumstances. For example, the density of the forest and/or the existence of substantial surface fuels in the area of the fire can mean that an area would be subject to severe intensity burning that make WFU inappropriate.

20. The WFSA evaluates the alternatives for suppression of the fire to determine the appropriate response, including a consideration of environmental impacts and mitigation. The Forest Service uses an Incident Management Team if the fire escapes initial attack or extended attack capabilities. The IMT reviews or assists in finalizing the initial WFSA and utilizes input from resource specialists from the unit (*e.g.*, archeologists, fish and wildlife biologists, soil scientists, hydrologists, and fire behavior specialists). The IMT gathers information and identifies strategies for managing the fire. The team then evaluates these alternative response strategies using various criteria: environmental, safety, social, and policy. The IMT members recommend modifications in suppression tactics based on available information, including tactics that mitigate or ameliorate the environmental effects of the wildland fire response. Based on the team's analysis of the alternatives, the Forest Supervisor or District Ranger selects a particular course of action, often referred to as the "appropriate management response."

21. The Forest Service generally deploys the initial response team on the ground within 1-2 hours. The initial WFSA analysis is generally completed within 24 hours. In most cases, selected "management response" commences as soon as possible. A fast response is paramount not only because of the resources that are immediately threatened but also because, left unchecked, wildland fires can spread, grow more severe, and potentially become impossible to control.

22. The Forest Service has the following general tools available to suppress wildland fires: (1) removal or reduction of flammable material adjacent to burning vegetation using hand tools, power tools, or machinery or (2) use of water, foam, or long term retardant applied by firefighters, engines or aircraft to either suppress or slow wildland fire.

23. The Forest Service contracts for fire retardant. Long term fire retardants contain ammonia salts (typically fertilizers) that alter the way the fire burns, decreasing the fire intensity and slowing the advance of the fire, even after the water they originally contained has evaporated. They continue to work until they are removed from the fuels by rain or extended weathering. In contrast, water is a short-term fire suppressant because it is only effective until it evaporates from the surface fuels. Water is only effective for a matter of minutes to several hours based on ambient temperature, relative humidity, fuel temperature, winds and the quantity delivered.

24. In addition to one or more of these response activities, emergency suppression rehabilitation activities are implemented during a fire. These are actions taken to minimize and/or mitigate the

impacts of suppression efforts. As with wildland fire response, the type and scope of emergency suppression rehabilitation is dictated the effects of the fire.

25. Incident management Teams manage large fires and implement the WFSA. They work with the local Forest Service unit as situations change and help adjust the WFSA as necessary. The WFSA is reviewed in its entirety daily and the IMT will recommend to the line officer when the WFSA needs modification.

26. During a wildland fire, the Forest Service provides information to, and seeks information from, the public. For each wildland fire that escapes initial attack, the Forest Service designates a Fire Information Officer. This Officer coordinates information needs on the fire, directs public meetings and postings and maintains fire information boards in public places. The Fire Information Officer explains fire suppression strategies at public meetings and the public has an opportunity to share its concerns and ideas. The Forest Service incorporates such comments into the management strategy, when practicable.

27. After a fire is extinguished, the Forest Service conducts Burned Area Emergency Rehabilitation ("BAER"), which is subject to it its own assessment, plan preparation, and approval processes. The main purposes of BAER activities are to mitigate watershed impacts and reduce downstream effects. BAER activities can include reseeding areas rendered bare during fire suppression; creating structures to protect slope stability in order to minimize erosion and sedimentation; and rehabilitating the camps used by firefighters.

28. Long Term retardants are delivered to the Forest Service in either a liquid concentrate or a powder form and are mixed with water at an air tanker base and when dropped are 85% water, 13% fertilizer salt, and the remaining ingredients are colorants and corrosion inhibitors. Retardants are either gum thickened (consistency of thick pudding) or liquid like water. Certain retardants contain sodium ferrocyanide inhibitor and some do not.

29. In FY 2003, 23,870607 gallons of retardant were pumped into air tanker, including Forest Service, BLM, and state bases for a total of 18,725 aircraft loads. Average costs to the federal and state users for retardant are approximately $10,0000,000 per year for the acquisition of the retardant concentrate.

30. The Forest Service does not keep statistics on the number of acres treated with retardant. However, in the event of an accidental drop into water, and if there are threatened or endangered species in that water, the local unit will consult with the appropriate Fish and Wildlife Service Office and prepare a biological assessment. Since 2001, there have been eight incidents with water drops into water. The report on these incidents is attached as Exhibit 2.

31. Fire retardant is often used in initial attack operations to reduce the intensity and rate of spread of a wildland fire until ground resources can arrive and initiate suppression actions. In this setting it can be applied directly to the side of the fire where it is spreading. When it is still slurry, consisting of water and retardant salts, it can act as a suppressant to burning fuels. The

retardants also can treat the unburned fuels in advance of the fire with retarding salts to slow additional fire growth.

32. Fire retardant can be used in support of ground resources that are already engaged in suppression action to reduce the intensity of fire near personnel to enable them to be more effective with their suppression actions. In this case, use of the water in the retardant is also effective as a suppressant.

33. Fire Retardant is also used in advance of a fire before it approaches a specific site on the landscape. In this case a "line" of fire retardant is placed in advance of the fire usually along natural breaks in the topography and surface fuels, where the control lines would have the greatest likelihood of success. Aircraft apply enough retardant "line" so that "anchor points" are tied together to ensure the fire will be forced to contact the line. To apply that much retardant in advance of the fire takes time, so that the water will have evaporated before the fire arrives. The fertilizer salts coating the surface fuels will still modify the fire intensity and spread rate, thus slowing the fire. This can give ground forces the time needed to construct an anchored fire line on the ground to contain the fire.

34. A Stop Work Order was issued for the National Retardant Contract in March 28, 2000 for those retardant products which contain sodium ferrocyanide. The Order was issued based on incorrect information contained within USGS Columbia Environmental Research Center's *The Effects of UVB Radiation On the Toxicity of Fire-Fighting Chemicals.* Report. The Stop Work

Order was issued to allow time for further evaluation of applicable guidelines and rules. The order affected 46 of the 75 interagency aerial retardant firefighting bases. The Forest Service determined that it could resume the use of retardant products subject to the Stop Work Order. The Order was rescinded on April 20, 2000.

35. As a result of the research on sodium ferrocyanide, the Department of the Interior firefighting agencies suggested that the Forest Service consider whether to undertake a NEPA analysis on the Guidelines. The Forest Service considered the request and attempted to do some environmental analysis at the national programmatic level. It became apparent to the Agency that there were no effects to analyze at the national, programmatic level. In addition, upon further consideration, the Agency came to the conclusion that there is no proposal for major federal action related to the national actions as to the use of chemical fire retardants.

36. The Forest Service began preparations of an environmental analysis type document. Based on the Agency's conclusion that the Guidelines are not subject to NEPA, the EA was never sent out for public comment or finalized. No decision was made by the Forest Service, and no record of decision even drafted. No Finding of No Significant Impact was made, nor was any determination made that the impacts were significant so as to require an EIS.

37. About 99% of fires are kept small, but 1% grow into large fires. It is impossible to quantify how many more fires would become large fires if we did not use retardant in initial attack

38. Since the initial consultation which resulted in the adoption of the Guidelines, units are required to follow the provisions contained in the Endangered Species Act (ESA). Pursuant to the requirements of the ESA, we have performed Section 7 Emergency Consultation procedures whenever it has been determined that: (1) retardant entered a waterway either through drift, pre-mature release, etc., and (2) that a threatened or endangered species is present in the waterway. The direction is clearly stated that as soon as it is determined that there is an issue, the action agency must consult with the US Fish and Wildlife Service and/or the National Marine Fisheries Service as required under 50 CFR 402.05.

39. For the period of August 2001 through December 2002, there were eight spills determined to meet this criteria, only six of which were on National Forest lands.

40. Three of the six spills were determined to be "May Effect, likely to adversely affect". These three spills resulted in emergency consultation with the Fish and Wildlife Service. The biological assessments and documentation prepared in conjunction with these consultations should be available at the local forest units. None of these emergency consultations resulted in the issuance of a "jeopardy" biological opinion from FWS.

41. The other three spills resulted in either a "may affect, not likely to adversely affect" determination, or there was no fish mortality. This, therefore, concluded the Forest Service's Section 7 Emergency Consultation obligations.

I declare under penalty of perjury that the foregoing is true and correct. Signed this 24th day of June 2004.

Alice Forbes, Assistant Director
Fire Operations, USDA Forest Service
WO-Fire and Aviation Management
National Interagency Fire Center

# EXHIBIT 1

**File Code:** 5160 **Date:** April 20, 2000

**Route To:**

**Subject:** Guidelines for Aerial Application of Retardants and Foams in Aquatic Environments

**To:** Regional Foresters and Area Director

Enclosed are revised guidelines for aerial delivery of retardant and foams which are to be implemented immediately. These guidelines will be effective until we complete additional field studies which will allow us to amend and refine the guidelines. With these guidelines in place, we were able to issue a Resume Work Order to FIRE-TROL Holdings, LLC.

In addition to these guidelines, we have committed to undertake two interagency studies which will start this field season. One will address the residual effects of the retardant on the forest environment and will look at areas where retardant was dropped during the 1999 fire season. The other study will look at the applicability of the laboratory results of the Columbia Environmental Research Center as recommended in their report. It is anticipated, with the results of these two studies, that we will be able to develop additional guidelines which will be acceptable to all agencies for emergency fire response.

Background information on this issue can be found on the web at: www.fs.fed.us/fire/.
If there are questions regarding these guidelines, please contact your forest or regional fire staff.

/s/ *Phil Janik*

PHIL JANIK
Chief Operating Officer

Enclosure

Declaration of Alice Forbes
CV-03-165-M-DWM

APPD-018
Aforbes
5160_ltr_chief_fire_trol_2000_04_19

**Guidelines for Aerial Delivery of Retardant or Foam near Waterways**

**Definition:**

WATERWAY – Any body of water including lakes, rivers, streams and ponds whether or not they contain aquatic life.

**Guidelines:**

**Avoid aerial application of retardant or foam within 300 feet of waterways.**

These guidelines do not require the helicopter or airtanker pilot-in-command to fly in such a way as to endanger his or her aircraft, other aircraft, or structures or compromise ground personnel safety.

Guidance for pilots: To meet the 300-foot buffer zone guideline, implement the following:

- Medium/Heavy Airtankers: When approaching a waterway visible to the pilot, the pilot shall terminate the application of retardant approximately 300 feet before reaching the waterway. When flying over a waterway, pilots shall wait one second after crossing the far bank or shore of a waterway before applying retardant. Pilots shall make adjustments for airspeed and ambient conditions such as wind to avoid the application of retardant within the 300-foot buffer zone.

- Single Engine Airtankers: When approaching a waterway visible to the pilot, the pilot shall terminate application of retardant or foam approximately 300 feet before reaching the waterway. When flying over a waterway, the pilot shall not begin application of foam or retardant until 300 feet after crossing the far bank or shore. The pilot shall make adjustments for airspeed and ambient conditions such as wind to avoid the application of retardant within the 300-foot buffer zone.

- Helicopters: When approaching a waterway visible to the pilot, the pilot shall

**Exceptions:**

- When alternative line construction tactics are not available due to terrain constraints, congested area, life and property concerns or lack of ground personnel, it is acceptable to anchor the foam or retardant application to the waterway. When anchoring a retardant or foam line to a waterway, use the most accurate method of delivery in order to minimize placement of retardant or foam in the waterway (e.g., a helicopter rather than a heavy airtanker).
- Deviations from these guidelines are acceptable when life or property is threatened and the use of retardant or foam can be reasonably expected to alleviate the threat.
- When potential damage to natural resources outweighs possible loss of aquatic life, the unit administrator may approve a deviation from these guidelines.

**Threatened and Endangered (T&E) Species:**

The following provisions are guidance for complying with the emergency section 7 consultation procedures of the ESA with respect to aquatic species. These provisions do not alter or diminish an action agency's responsibilities under the ESA.

Where aquatic T&E species or their habitats are potentially affected by aerial application of retardant or foam, the following additional procedures apply:

1. As soon as practicable after the aerial application of retardant or foam near waterways, determine whether the aerial application has caused any adverse effects to a T&E species or their habitat. This can be accomplished by the following:

    a. Aerial application of retardant or foam outside 300 ft of a waterway is presumed to avoid adverse effects to aquatic species and no further consultation for aquatic species is necessary.

    b. Aerial application of retardant or foam within 300 ft of a waterway requires that the unit administrator determine whether there have been any adverse effects to T&E species within the waterway.

    These procedures shall be documented in the initial or subsequent fire reports.

2. If there were no adverse effects to aquatic T&E species or their habitats, there is no additional requirement to consult on aquatic species with Fish and Wildlife Service (FWS) or National Marine Fisheries Service (NMFS).

3. If the action agency determines that there were adverse effects on T&E species or their habitats then the action agency must consult with FWS and NMFS, as required by 50 CFR 402.05 (Emergencies). Procedures for emergency consultation are described in the Interagency Consultation Handbook, Chapter 8 (March, 1998). In the case of a long duration incident, emergency consultation should be initiated as soon as practical during the event. Otherwise, post-event consultation is appropriate. The initiation of the consultation is the responsibility of the unit administrator.

Each agency will be responsible for insuring that the appropriate guides and training manuals reflect these guidelines.

# EXHIBIT 2

## SUMMARY OF ALL KNOWN RETARDANT APPLICATION IN WATERWAYS AUGUST 2001 THROUGH DECEMBER 2002

| FIRE NAME, SIZE, and DATE | LOCATION | MAGNITUDE (SPECIES AND MORTALITY) | EFFECTS DETER-MINATION* | MAGNITUDE - RESOURCES AT RISK OR LOST | PRODUCT APPLIED |
|---|---|---|---|---|---|
| Biscuit 499,570 ac., July-Nov 2002 | Siskiyou NF | SOCC Chinook, SONC Coho - No mortality | LAA (all suppression action) | Not identified in BA Towns of Galice, Cave Junction, Kerby, Selmac, O'Brian, Agness, Brooking, Power line serving Gasquet, Hiouchi, Cresent City, and Klamath, Industrial timberlands, Late-success ional Reserve, T,E&S fish, plant and animals, Illinois, Rogue and Smith Nat. Wild and Scenic River, N. Fk. Smith Botanical Area, Port Orford Cedars | Not identified |
| Byerly 23,573 ac., and Cache 4200 ac., July-Aug 02 | Deschutes NF, Street Cr. | Interior Redband Trout, Columbia River Bull Trout - 260 red band, 1 bull trout, 2 kokanee mortality | LAA, NLAA, WIFV (all suppression actions) | 20 homes lost, timber, private timber, Black Butte Ranch subdivision and resort community; 1,300 residents, 15 commercial properties, 2 golf courses. | Astaris, Phos Chek |
| Forks Fire 1387 ac. June 2002 | Klamath NF | SONCC Coho salmon – No mortality | NLAA (all suppression actions) | Timber, mining, recreation, private land and structures, plantations, Spotted Owl Habitat | Phos Chek D75 |
| Bowl Fire 339 ac., Sept. 2002 | Mt. Hood NF Clackamas River | Lower Columbia River steelhead, Upper Willamette Rive Chinook and Lower Columbia River/SW Washington Coho salmon –No mortality | LAA (all suppression action) | Not identified in BA info received, Fisheries including T&R species, Wild and Scenic River values, PGE Power lines, Hwy 224, and Cultural Sites. The Clackamas River is the municipal water supply for communities downstream (Estacada, Oregon City, Lake Oswego, and others) | Fire Trol LCG-] |
| East Fork Size not listed, 2002 | Wasatch Cache NF | Not specified, No mortality | No BA known | Not identified in info received | Not identified |
| St Mary's Mission 8112 ac., Aug. 2001 | Omak Creek Colville Confederated Tribes | 10,040 rainbow and brook trout plus all natural reproduction of summer steelhead for 7.2 miles, spring Chinook | No BA known | Not identified in info received. | Fire Trol |
| Fall River, 1 ac., Aug. 2002 | Oregon State | 21,000 total fish (no info on species) | No BA known | Hundreds of homes | Fire Trol |
| Cannon Fire, 23,013 ac. June-July 2002 | Humboldt-Toiyabe NF. Walker River | Lahontan Cutthroat Trout, Bald Eagle Mortality not known | LAA, (all suppression activities, and implementation of emergency rehabilitation) | Evacuation of the Camp Antelope sub-division. Air Tanker crash (3 fatalities). Approximately 1200 people were affected by the evacuation. | Not identified |

*Effects Determinations

Threatened and Endangered Species under Section 7 of the Endangered Species Act

| | |
|---|---|
| NE | No Effect |
| NLAA | May Effect, Not Likely to Adversely Affect |
| LAA | May Effect, Likely to Adversely Affect |
| BE | Beneficial Effect |

Sensitive Species

| | |
|---|---|
| NI | No Impact |
| MIIH | May Impact Individuals or Habitat, but Will Not Likely Contribute to a Trend Towards Federal Listing or Cause a |